## BARINGS *v.* DABNEY.

1. Though the stock of a bank be altogether owned by a State, if the bank is insolvent its assets cannot be appropriated by legislative act or otherwise to pay the debts of the State, as distinguished from the debts of the bank. Those assets are a trust fund first applicable to the payment of the debts of the bank.

2. An act of the legislature requiring the managers of an insolvent bank belonging to the State to hold its assets appropriated to the payment of certain specified debts, creates a trust in favor of the creditors holding said debts, and, if assented to by them, amounts to a contract with them to carry out said trust.

3. If such an act, however, has the effect to appropriate the assets of the bank to pay the debts of the State, to the prejudice of billholders and other creditors of the bank, it is repugnant to that clause of the Constitution which prohibits a law impairing the obligation of contracts, and is void.

4. Such an act passed by the legislature of South Carolina in reference to. the assets of the Bank of the State of South Carolina, declared to be void.

ERROR to the Supreme Court of South Carolina; the case being thus:

In 1812, the legislature of South Carolina, by a legislative act, created a bank by the name of the Bank of the State of South Carolina. The capital was to consist of various stocks, bonds, and securities specified, then belonging to the State; the same being in fact all the stocks, bonds, and se-

curities which the State owned. The bank thus belonged to the State. The president and directors were to be elected by the legislature, and were made a corporation and body politic. The faith of the State was pledged for the support of the bank, for the supply of any deficiency in the funds specially pledged, and for making good all losses arising from such deficiency. The usual powers were conferred upon the corporation; to purchase, hold, and transfer property of all kinds; to sue and be sued; to adopt its own rules and by-laws; to issue notes, and to make loans by way of discount, secured by mortgage; and to do all acts which might appertain to its functions as a bank.

In December, 1821, by another legislative act, the future profits of the bank were pledged and set apart for the payment of a certain 6 per cent. stock, which the State had previously issued.

In 1838, the city of Charleston suffered from an extensive fire, and the legislature passed, in that same year, an act entitled "An act for rebuilding the city of Charleston."

By the first section of this act the governor was directed and required, in the name of the State, to issue bonds or other contracts not exceeding $2,000,000, for the purpose of procuring a loan on the credit of the State to rebuild the burnt portion of the said city; and the faith and funds of the State were pledged for the punctual payment of the bonds or contracts, with interest.

By the third section the money, when obtained in Charleston, was to be deposited in the bank, and become a part of its capital.

By the tenth, eleventh, and twelfth sections it was enacted as follows, to wit:

"SECTION 10. It shall be the duty of the president and directors of the Bank of the State of South Carolina to make proper provisions for the punctual payment of the interest of such loan, and also for the ultimate payment of the principal thereof.

"SECTION 11. It shall be the duty of the president and directors of the Bank of the State of South Carolina to cause to be opened in the books of said bank an account in which they shall

debit themselves with the *profits* arising out of the additional *capital* created out of the two millions loan aforesaid, for the year ending October 1st, 1839, and with *all the future profits* of the said loan as the same shall hereafter be annually declared; which said fund, with its annual accumulations, shall be considered solemnly pledged and set apart for the payment of the interest on said loan and the final redemption thereof; and it shall be · the duty of the president and directors of the said bank annually to report to both branches of the legislature the exact state of that fund.

"SECTION 12. When the *profits* of the said Bank of the State of South Carolina shall have paid the interest of certain stocks for which they have been heretofore pledged and set apart, the said *profits* shall also be considered solemnly pledged and set apart for the payment of the interest on the said loan and the final redemption thereof."

Under this act a large amount of *bonds,* known as "Fire Loan *bonds*," were issued and negotiated, of which £109,000 payable in London, and due in 1868, were still outstanding in the hands of Baring Brothers & Co. These bonds, by an indorsement thereon, were guaranteed by the bank.

Certificates of State *stock,* known as "Fire Loan *stock*," were also issued under the act, payable at the State treasury, and not expressly guaranteed by the bank; of which $318,000 were still outstanding in the hands of a few persons in South Carolina.

Notwithstanding the directions of the eleventh section of the act of 1838, to keep a distinct account of the profits arising out of the additional capital created by the two millions loan, no such account was ever kept; and though the net profits of the bank were annually ascertained, the particular sources from which they arose could not be distinguished, so that at the close of the rebellion in 1865, during which the resources of the bank had been enormously drawn on by the State, the assets which remained were a product made up of capital increased by profits, and the sum diminished by losses till insolvency had supervened.

The bank being thus, at the close of the war, insolvent,

the General Assembly, on the 21st of December, 1865, passed an act, entitled "An act to raise supplies for the year," &c.; by the eleventh section of which it was enacted,

"That the president and directors of the Bank of the State of South Carolina be, and they are hereby authorized and required to close the branches and agencies of said bank, and that the principal bank at Charleston shall cease to be a bank of issue, but shall continue to act as a bank of deposit until further action of the legislature; and the said president and directors are hereby authorized and *required* to collect the assets and property of the bank, and hold the same especially appropriated,

"*First.* To the payment of the principal and interest of the bonds known as the Fire Loan bonds, payable in Europe.

"*Second.* To the payment of the principal and interest of the Fire Loan bonds, payable in the United States; and,

"*Third.* To the redemption of outstanding notes hitherto issued by said bank."

In October, 1867, before the scheme provided in this act was carried out, Dabney, Morgan & Co., holding bills of the bank, filed the bill in this case in the Chancery Court of First Instance of the State for the Charleston District, on behalf of themselves and all other billholders of the bank, against the Baring Brothers & Co. (the holders of £109,000 Fire Loan *bonds*), and the persons in South Carolina holding the $318,000 of the Fire Loan *stock.*

Dabney, Morgan & Co. insisted that the Fire Loan bondholders and Fire Loan stockholders were not creditors of the bank, and that the act of 1865 was unconstitutional in that, by directing the property of the bank to be applied to the payment of the debts of the State, which were not debts of the bank, it impaired the obligation of contracts. The bill prayed that the bank might be restrained from carrying the act into effect, and that the complainants and other billholders might be decreed to be paid out of the property and assets of the bank.

The Barings, as Fire Loan bondholders, and the other defendants, as Fire Loan stockholders, answered, each relying largely for himself on the clauses already quoted of the act

of 1838; appropriating the *profits* of the loan (after the payment of the interest on the earlier 6 per cent. stock which had confessedly long since been paid off) to the payment of the Fire Loan; and the argument of their counsel, in view of the fact that no separate account had been kept of the profits, being that a pledge of *profits* carried the capital from which the profits came; in the same way as the bequest of the interest of public funds, or of the dividends of stock, or a devise of the rents and profits of an estate, is a bequest of the funds or stock themselves, or a devise of the estate from which the rents and profits sprung.*

The Barings especially (rather than the Fire Loan stockholders) relied on the act of 1865. They said in their answer:

"If it was apparent in 1865 that, from the force of circumstances, the State would be unable to meet its obligations at the maturity of the bonds in July, 1868, this was in itself good ground for legislative interference to confirm the appropriation of funds as originally pledged.

"Nor was the act of 1865 either unconstitutional, as impairing the obligation of contracts, or contrary to good faith, equity, or conscience.

"The bank had long suspended its payments, and, from the events of the war, was not in a condition to pay at once all its creditors. No bankrupt law existed at the time of the passage of the act. The legislature represented the sole stockholder. Its power and control over the bank was, at least, equal to that of the united stockholders of a private bank. The bank was but its servant. The legislative will was supreme. This paramount power, exercising for the corporation the ordinary privileges accorded, as defendants are advised, by the then existing law, undertook to prefer certain named creditors, while the whole of the assets were appropriated to the payment of debts, nothing being reserved to the corporation or stockholder controlling. The defendants submit that the preferences made were not only in conformity with the then existing law and with good faith, but in accordance with the strictest equity and most

---

* Philipps *v.* Chamberlain, 4 Vesey, 51; Legard *v.* Hodges, 3 Brown's Chancery, 531; Stewart *v.* Garnett, 3 Simons, 398.

enlightened conscience. They aver that the act was a statutory assignment of assets for the benefit of creditors, and that the said assignment was executed by the highest power known to the corporation, and in form the most solemn."

During the pendency of this suit the legislature of South Carolina, by an act passed September 15th, 1868, entitled "An act to close the operations of the Bank of the State of South Carolina," amongst other things repealed the eleventh section of the act of December 21st, 1865, above referred to.

On the 7th of May, 1870, the Court of First Instance, where the bill was filed, decreed that the Fire Loan bondholders and Fire Loan stockholders be first paid *pari passu*, out of the assets of the bank; and that any surplus be applied *pro rata* to the billholders, depositors, and other creditors, after adjusting the claims that arose during the war to the value thereof in United States currency. This decree disregarded the eleventh section of the act of 1865 altogether, as being unconstitutional, on two grounds: first, as disposing of property which the State did not own, and violating a solemn contract, on the faith of which the loan was taken; and secondly, as having no relation to the other matter of the act, and the subject of it not being expressed, as the constitution of South Carolina requires that each subject of an act should be, in its title. The contract which the court held to have been violated by this section, was the pledge of profits contained in the eleventh and twelfth sections of the act of 1838, authorizing the Fire Loan. The court held not only that the pledge of the profits was a pledge of the capital, but that the capital had all been drawn out by, and returned to, the State, and that the resulting fund now remaining consisted only of profits. The court further held that this pledge of profits related to both branches of the Fire Loan alike, and that the Fire Loan *stock* stood on an equal footing with the Fire Loan *bonds*, although the latter only had been guaranteed by the bank.

The Supreme Court of South Carolina, on appeal, reversed this decree, placing the Fire Loan *bond*holders on an equality with the other creditors, and holding that the Fire

Loan *stock*holders were not creditors of the bank at all, and not entitled to any participation in the fund; and directed the assets to be distributed among all the creditors of the bank, in proportion to the amount of their claims, reducing those arising during the war to their value in National currency.

The grounds on which this decree was made were:

First, that the pledge of profits in the act of 1838 expressly related to profits as distinguished from the capital; that no separate account of such profits had ever been kept; and that the result was, in fact, a loss instead of profit, the small residue of assets yet subsisting being the joint result of capital, deposits, and moneys received from loans and discounts; and, therefore, that the pledge relied on by the Fire Loan bondholders and stockholders had nothing specific and distinct on which to attach; and that, in fact, nothing was in existence on which it could attach.

Secondly, that the Fire Loan bondholders were to be admitted as creditors only by virtue of the express guarantee of the bonds of the bank; and that the Fire Loan stockholders were to be excluded because the bank had never guaranteed said stock.

Thirdly, that no claim could be sustained by either under the eleventh section of the act of 1865, because that act did not amount to an assignment (which could only be made by the bank), but amounted only to a direction which was never carried into effect, which the State, as sole stockholder of the bank, could, at any time before its execution, revoke, and which, by the act of September, 1868, repealing the said section, it did revoke; and that if the act of 1865 had amounted to an assignment, it could not have been sustained as to the Fire Loan *stock*holders, because they were not even creditors of the bank.

This decree was brought here by a writ of error, under the second section of the act of the 5th of February, 1867.*

---

* See the act (re-enacting or amendatory of or a substitute for the twenty-fifth section of the Judiciary Act), 17 Wallace, 681.    Appendix.

The interposition of this court was invoked on the ground that the eleventh section of the act of 1865 became a contract with the Fire Loan bondholders and Fire Loan stockholders, and that the validity of the said contract was impaired by the act of 1868, which repealed the said section, and which repealing act was sustained by the decree of the Supreme Court of South Carolina.

*Messrs. I. W. Hayne and W. W. Boyce, for the plaintiffs in error ; Mr. D. H. Chamberlain, contra.*

Mr. Justice BRADLEY delivered the opinion of the court.

The first question for us to decide is whether the eleventh section of the act of 1865 did, as alleged, amount to, or did become, a contract with the appellants.

When that act was passed the bank was hopelessly insolvent. The section referred to was intended to prescribe the manner in which its assets were to be distributed and its affairs wound up. The State was the sole stockholder, and the bank, as a corporation, could not complain of any course of action which the legislature saw fit to adopt or prescribe. In relation to the State, it was *alter et idem.* In this respect its position was very different from that of private corporations. The action of the legislature could only be questioned by the creditors of the bank. As to the bank itself, the wishes of the legislature were commands. When, therefore, the legislature, by the eleventh section of the act of 1865, declared that " the president and directors [of the bank] are hereby authorized *and required* to collect the assets and property of the bank, and hold the same specially appropriated, first, to the payment of the principal and interest of the bonds known as the Fire Loan bonds, payable in Europe ; second, to the payment of the principal and interest of the Fire Loan bonds, payable in the United States ; and third, to the redemption of outstanding notes hitherto issued by the bank," this declaration, if valid, was not only a direction, but a law. It was a law which the bank could not question ; only creditors, whose interests were in conflict

with it, could question it. As an enactment, it created *ipso facto*, a trust, and made the bank a trustee for the parties provided for by it. It was a trust on which the bondholders, when made acquainted with its terms, had a right to rely. They became, if they assented to it, *cestuis que trust* with vested rights. Being made for their benefit, it will be presumed that they did assent to it, if they expressed no dissent.

It is unnecessary to go into the learning of voluntary assignments for the benefit of creditors. It is clear law that such an assignment, if assented to by the creditors, or a considerable portion of them, becomes irrevocable; and in this country assent will be presumed if dissent is not expressed.*

In this case, it is true, no actual assignment was made. But for the purpose of creating a trust it was not necessary. The act was a law of the State making the corporation a trustee. What special rights were thus created in favor of the *cestuis que trust* will be noticed hereafter.

The creation of this trust in favor of the bondholders, if valid, was a contract with them. Confiding in it, they would desist from further efforts to secure the payment of their claims by adverse proceedings. It would be unjust to them to abrogate it, and place them where they stood when the trust was created. The repeal of the section in question, therefore, did impair the validity of this contract, and, if the latter was valid, was a violation of the Constitution.

This conclusion, however, is based on the assumption that the law itself, namely, the eleventh section of the act of 1865, was a valid law. If it was not valid its repeal cannot be questioned. It is contended before us that it is invalid because it appropriates the assets of the bank to persons who are not creditors of the bank, but creditors of the State only. The objection taken, if valid in fact, is a good one. It was expressly decided in *Curran* v. *The State of Arkansas*,† that if the capital of a State bank, like the one in question, be

---

\* The cases on this subject will be found collected in Burrill on Assignments, 84, 309, 418.

† 15 Howard, 304.

withdrawn by the State, either for the payment of its own
debts or for deposit in the State treasury, it is a violation of
the pledges by which the capital of the bank, though de-
rived from State resources or State obligations, was set apart
and appropriated as the basis of the independent credit of
the bank; and that a law passed to effect such a withdrawal
or misappropriation impaired the validity of the contracts
held by the creditors of the bank.

That case had in it many features of the present one.
The legislature of Arkansas, amongst other things, required
the bonds of the State held by the Bank of Arkansas to be
given up and cancelled; and authorized the bank officers to
receive in payment of debts due the bank bonds of the State.
issued to raise capital stock for the bank, notwithstanding
the bills of the bank might not have been taken up.   "We
cannot attribute to this provision of the law," says the court,*
"any other meaning or effect than what is plainly apparent
on its face.   It authorizes and requires the assets of the
bank to be appropriated to pay debts of the State; and we
cannot conceive how this can be reconciled with the rights
of creditors to those assets."   The bank in that case, as in
this, was insolvent, and the court held that all its assets
formed a trust fund for the payment of its creditors; and
that a stockholder could not lawfully withdraw any part of
this fund from appropriation to that object; and that a law
passed for that purpose was unconstitutional.   The majority
of the court was clearly of opinion that a right on the part
of the State to withdraw the funds of the bank for the uses
of the State, or to pay the debts of the State, would render
the bank itself obnoxious to the tenth section of the first
article of the Constitution, which prohibits a State from
emitting bills of credit, inasmuch as it would destroy the
distinctive existence and independent credit of the bank,
which independent credit is founded on the inviolability of
the capital pledged for the payment of its debts.

Now, in this case, the assets of the Bank of the State of

---

* 15 Howard, 317.

South Carolina, which still remained in 1865, were the resultant of all its capital and operations. We hold with the Supreme Court of the State that they were not profits, nor the subject of any previous pledge of profits to any specific class of debts. Any question, therefore, arising upon any such previous pledge may be laid out of the case. The only question is, whether the appropriation by the State legislature of these assets to the payment, first, of the Fire Loan bonds, and, secondly, of the Fire Loan stock, was valid and effectual.

As to the latter, we think the Supreme Court was clearly right. The Fire Loan stock was clearly not a debt of the bank, but a debt of the State alone; and the appropriation of the assets of the bank to its payment was directly within the case of *Curran* v. *The State of Arkansas.*

As to the Fire Loan bonds, there is more room for doubt. These bonds were the debts of the State, and not of the bank, it is true, but their payment was guaranteed by the bank; and it is strenuously insisted that this circumstance rendered them so far obligations of the bank that the latter might be justified in providing for their payment in preference to their other creditors. Had the bank done this, the question as thus presented would have fairly arisen. But the bank, as a distinct entity, never did make such an appropriation of its assets. The appropriation which was made was an appropriation by law; and that law was made by the State itself—the principal debtor. The case was the same, in principle, as the Arkansas case. The legislature of South Carolina, by law, appropriated the assets of the bank to pay the debts of the State. This it could not do without violating the pledges made to the creditors of the bank, even though the particular debts thus preferred were guaranteed by the bank. The Fire Loan bonds were not due by several years when this act of appropriation was attempted to be made. No claim had yet accrued thereon against the bank. So far as appears, there were not even any arrears of interest due. It did not then appear that the bank ever would be liable for the debt. It was the duty of the State to prevent

such liability from ever arising. These special circumstances under which the law of 1865 was passed bring it still more clearly within the decision of *Curran* v. *The State of Arkansas.*

The decree of the Supreme Court of South Carolina must be

AFFIRMED.

Mr. Justice STRONG : I concur in the judgment given in this case, but not in all the positions taken in the opinion of the majority of the court. I cannot regard the eleventh section of the act of the General Assembly of South Carolina, passed December 21st, 1865, as amounting either to an assignment or a declaration of trust of the property of the bank in favor of the holders of the Fire Loan bonds. In my opinion it effected no transfer, either legal or equitable, and vested no interest in the creditors. Hence the repeal of the act by the legislature, in 1868, was no disturbance of any vested rights, and it is not obnoxious to the objection that it impaired the obligation of any contract. For this reason, and for this reason alone, I think the judgment should be affirmed.

Justices MILLER and DAVIS expressed their concurrence in what was said by Mr. Justice Strong.