# STANLY COUNTY *v.* COLER.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 264.   Argued April 27, 28, 1903.—Decided June 1, 1903.

While as a general rule Federal courts will accept the interpretation put by the courts of a State upon its own constitution and statutes, yet where the law has not been definitely settled, it is the right and duty of Federal courts to exercise their own judgment.

A presumption that the duty devolving upon the officers of a county of ascertaining the conditions upon which bonds of the county may be issued was properly exercised should and does accompany and guarantee such bonds.

County bonds issued under statutes and sections of the Code of North Carolina which permit bonds to be issued to enable counties to subscribe to stock when necessary to aid in the completion of any railroad in which citizens of the county may have an interest, *held* to be valid notwithstanding that the Supreme Court of the State had decided in another action that such bonds were invalid.

THIS suit was brought in the United States Circuit Court for the Western District of North Carolina, by the respondents against the petitioner, to recover on certain coupons attached to bonds, alleged to have been issued by Stanly County, State of North Carolina, in part payment of the subscription of said county to the capital stock of the Yadkin Valley Railroad Company. The bill alleged the following facts:

The Yadkin Valley Railroad Company was organized as a corporation under the laws of North Carolina, to construct and operate a railroad running from Salisbury in that State, south to Norwood, a point in Stanly County.

The incorporation of the said company was under and by virtue of chapter 236 of the Acts of 1870, passed by the legislature for that year; and the said chapter was amended by an act of the legislature, chapter 183 of the Acts of 1887.

The county, being desirous of aiding in the construction of said road, and acting through its proper authorities, subscribed the amount of $100,000 to the capital stock of the company, in pursuance of the authority and power conferred upon the said county under and by virtue of the acts of the legislature of North Carolina as above set out; and, also, under and by virtue of sections 1996, 1997, 1998 and 1999 of the Code of North Carolina, all of the said acts and sections of the Code of North Carolina having been enacted and become laws in accordance with the constitution of the State.

The county still holds the stock and derives benefit from the road in increased facilities for transportation, greatly increased value of the lands of the county and from the taxes paid thereon. A copy of the bonds was attached to the bill, and is inserted in the margin.[1]

---

[1] EXHIBIT A.

(Copy.)

*County of Stanly Six per Cent Bond.*

Stanly County, State of North Carolina, is indebted to the bearer in the sum of five hundred dollars, lawful money of the United States, payable on the first day of July, A. D. one thousand nine hundred and twenty, with interest thereon from the first day of July, A. D. one thousand eight hundred and ninety, at the rate of six per cent per annum, payable on the first

The bonds were exposed for sale and the respondents became purchasers of them in good faith, and at the highest market price, and without any notice, express or implied, that there was any suggestion of their being void, invalid, fraudulent or otherwise than perfectly legal in their issue and sale.

Interest on the bonds issued as the same has become due has not been paid for the last four years. The coupons due and the amounts thereof are as follows:

48 Stanly County coupons, Nos. 2, 46, 48, 49 and
     72, $60.00 each  .  :  .  .  .  . $2880 00

33 Stanly County coupons, Nos. 81, 92, 95, 96,
     98, 103, 110, 112, 116, 118, 120, all numbers in-
     clusive, $30.00 .  .  .  .  .  .  990. 00

          Making the sum of  .  .  .  . $3870 00

day of July in each year at the First National Bank of Salisbury, North Carolina, on presentation and surrender of the respective coupons hereto attached, as they severally become due and payable. This bond is one of a series of eighty of the denomination of one thousand dollars each, and forty of the denomination of five hundred, making a total of one hundred thousand dollars, issued by authority of an act of the general assembly of North Carolina, ratified the third day of March, A. D. 1887, entitled "An act to amend the charter of the Yadkin Railroad Company," and of sections 1996, 1997, 1998 and 1999 of the Code of North Carolina, and authorized by a majority vote of the qualified voters of Stanly County, at an election regularly held for that purpose on the 15th day of August, A. D. 1889, duly ordered by the board of commissioners of Stanly County.

This series of bonds is issued to pay the subscription of one hundred thousand dollars made by Stanly County to the capital stock of the said railroad, known as "The Yadkin Railroad Company." Stanly County reserves the privilege of paying the principal and interest of any or all of this series of bonds at any time after the expiration of ten years, upon the board of commissioners of said county first giving three months' notice of such payment in some newspaper published in said county, when such bonds shall be paid, according to number, beginning with number one.

In testimony whereof, the chairman of the board of county commissioners of Stanly County hath hereunto subscribed his name, for and on behalf of said board, and the clerk of the Superior Court of Stanly County hath countersigned the same and affixed thereto the seal of said Superior Court, this first day of July, A. D. one thousand eight hundred and ninety.

                            —— ——, *Chairman.*

Countersigned : —— ——, *Clerk of Superior Court.*

The payment of said sums was demanded at the proper time and refused, although the said total sum had been collected from the tax payers of the county by the board of commissioners, in pursuance of the power conferred upon them, and was in the hands of I. W. Snuggs, (one of the petitioners here,) as treasurer of the county, and he having received the same for the payment of said interest, became and is the trustee and agent of the bond and coupon holders, and therefore holds the same "for the use and in trust for complainants." The complainants are informed and believe that the reason why said treasurer has not accounted to them is that he has been restrained by a certain process of injunction, issued by one of the Superior Courts of the State of North Carolina in a suit brought in the name of the board of commissioners, and in the names of James P. Nash and G. R. McCain as plaintiffs, and against the said I. W. Snuggs as defendant, but that complainants were not made parties to the same, nor was any other bondholder. The treasurer and board of commissioners unless restrained will dispose of the fund collected as aforesaid. An injunction was prayed, and the statement of an account, and the appointment of a receiver asked.

The answer attacked the validity of the bonds, and averred that their invalidity was adjudged by the Supreme Court of the State in the case of *Commissioners* v. *Snuggs*, 121 N. C. 394, " and that there has been no other decision or judgment given by said Supreme Court in conflict with the aforesaid decision ; but that the said decision is uniform with the decision of the same court, delivered in the case of *Bank* v. *The Commissioners*, 119 N. C. 214, which are the only two cases in which the principle or validity of these bonds has ever been before the Supreme Court of the State." There were proper replications made to the answer. The case was submitted on the pleadings and certain exhibits, some of them being the records of the suits in the courts of North Carolina.

The grounds upon which the bonds are claimed to be invalid are indicated in the opinion. A decree was entered declaring and adjudging the bonds to be valid obligations of the county of Stanly ; that complainants (respondents here) in the suit

were *bona fide* purchasers and holders thereof; that I. W. Snuggs was the trustee of the bondholders, and held the sum of six thousand dollars as such trustee for the benefit of the bondholders under and by virtue of the law and the orders of the board of commissioners of the county, and for the sole purpose of paying off and discharging the interest due on the bonds as set out in the bill. The decree also appointed a receiver for said sum, and ordered that said I. W. Snuggs pay the same to the receiver. It was further adjudged that the board of commissioners of Stanly County be enjoined from in any manner interfering with the execution and performance of the decree. The decree was reversed by the Circuit Court of Appeals and the cause was remanded "with directions to dissolve the injunction, discharge the receiver, and dismiss the bill." 37 C. C. A. 484. A rehearing was granted; and the decree of the Circuit Court was affirmed. 113 Fed. Rep. 705.

*Mr. James E. Shepherd* and *Mr. A. C. Avery* for petitioners. *Mr. C. M. Busbee* was on the brief.

*Mr. John F. Dillon* for respondents. *Mr. Harry Hubbard*, *Mr. John M. Dillon* and *Mr. Charles Price* were on the brief.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

It will be observed that the bonds recited that they were " issued by authority of an act of the general assembly of North Carolina, ratified the third day of March, A. D. 1887, entitled ' An act to amend the charter of the Yadkin Railroad Company,' and of sections 1996, 1997, 1998 and 1999 of the code of North Carolina, and authorized by the majority vote of the qualified voters of Stanly County, at an election regularly held for that purpose, on the 15th day of August, A. D. 1889, duly ordered by the board of commissioners of Stanly County." The act of March 3, 1887, referred to, was an amendment of the act by which the Yadkin Railroad Company was incorporated, (1870 –'71,) and was declared by the Supreme Court of the State not

to have been passed in accordance with the constitutional provision, requiring the yeas and nays to be entered upon the journals of each house of the general assembly. *Bank* v. *Commissioners*, 119 N. C. 214; *Commissioners* v. *Snuggs*, 121 N. C. 394. The ruling was decided to be binding upon this court. *Wilkes County* v. *Coler*, 180 U. S. 506; *S. C., ante*, p. 107.

The same objection does not lie to the sections of the code of North Carolina recited in the bonds, and the controversy in the pending case turns upon the meaning of those sections and the effect of the recitals in the bonds.

Section 1996 provides as follows: "The boards of commissioners of the several counties shall have power to subscribe stock to any railroad company or companies, when necessary to aid in the completion of any railroad in which the citizens of the county may have an interest." This section and the four succeeding sections were the reproductions of a statute passed in 1868–'9, a few days more than a year after the constitution of 1868, and were passed upon and interpreted by the Supreme Court of North Carolina in *Commissioners* v. *Snuggs, supra*. The court said:

"It is most reasonable to conclude that the policy and purpose of both the constitutional provision and the statute (code provisions) were the same, the only difference being that in case of state aid no approval by vote of the people was required, while a majority vote of the people was required in cases of county aid. The object of the statute must have been to provide by a general act means by which counties, without special legislation for each county by separate bills, might be enabled to complete unfinished railroads in which the counties had a pecuniary interest. At the same time of the enactment of the statute of 1868–'9 and always since that time any county of the State duly observing the limitations of section 7 of article VII of the constitution, and under an act passed according to the requirements of section 14, article II of the constitution, could and can subscribe to the capital stock of the railroad company whether unfinished or to be begun. The act of 1868–'9, however, considering the condition of affairs then existing, that is, that there were counties which had a pecuniary interest in rail-

roads that had been begun but were unfinished, enabled such counties to make subscriptions of bonds to complete such unfinished roads at the earliest moment and with the least cost, by a general law passed according to section 14, article II, of the constitution. This reasoning leads us to the still further conclusion that, at the time when the act of 1868–'9 was brought forward in the Code, section 1996, and the four succeeding sections, it could have had reference to no cases except those where the counties had a pecuniary interest in unfinished railroads at the adoption of the constitution of 1868, and that, therefore, the code sections could not apply to the present case, because the Yadkin Railroad was not begun to be constructed until about 1889."

It will be observed, therefore, that the Supreme Court decides that the interest of the county must have been *pecuniary*, and the railroad must have been begun *at the adoption of the constitution of 1868.*

To this case the respondents oppose the contentions that its interpretation of the constitution and code sections is (1) incorrect, and this involves the further contention that we may exercise an independent judgment of them; (2) that the recitals in the bonds were assurances to *bona fide* purchasers that the conditions expressed had been fulfilled. In other words, the recitals were assurances that the county had a pecuniary interest (assuming such to be the interest meant) in the Yadkin Railroad, and that the road had been begun before the bonds were issued—even begun before the adoption of the constitution of 1868. As far as the contention includes both dates, we may immediately dispose of it. We cannot assent to the view that purchasers of the bonds could have assumed that the railroad had been begun before the adoption of the constitution of 1868. The adoption of the constitution antedated the charter of the company. It would therefore be extreme to hold that purchasers of the bonds could have assumed that the railroad had been begun before it was authorized to be built, or that a different act of incorporation could have been assumed from that which the bonds themselves indicated. Commercial securities must necessarily be fortified by many presumptions, as

we shall hereafter have occasion to remark, but it would be straining somewhat to hold that a purchaser of bonds issued for a subscription to the capital stock of a railroad company could assume that the company existed prior to the time stated in the bonds or was incorporated by a different statute than that mentioned. Pretermitting consideration of the other conditions for a time, we are brought to the contention of the respondents, that we are not constrained to follow the opinion of the Supreme Court of North Carolina.

The general rule undoubtedly is that we accept the interpretation put by the state courts upon the state constitutions and statutes. There are exceptions to the rule, and the case at bar presents one of them. The rule and its exceptions are stated in *Burgess v. Seligman,* 107 U. S. 20, and the many cases by which the rule was sustained are collected in a note on page thirty of the opinion. In that case a statute of Missouri provided that the stockholders of a corporation at its dissolution were liable for its debts. It also provided that no person holding stock as executor, etc., or holding stock as collateral security, should be personally liable, but the persons who pledged the stock should be considered as holding the same, and be liable. The Supreme Court of Missouri held that the exemption of the statute did not extend to persons receiving from the corporation itself stock as collateral security. This court decided to the contrary, and held that it was not bound to follow the decision of the Supreme Court of the State. The question presented was regarded as one of commercial law and general jurisprudence, and the right to exercise our own judgment was asserted. It was said that state decisions were to be followed when they had become a rule of property, and that "this is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the Federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the Federal courts to exercise their own judgment; as they also always do in reference to the doctrines of commercial law and general

jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision of the state tribunals, the Federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the State courts after such rights have accrued."

*Burgess* v. *Seligman* was applied in *Folsom* v. *Ninety-Six,* 159 U. S. 611, to sustain the validity of bonds issued by the defendant township to aid in the construction of a railroad. The power to issue them depended upon several statutes and the constitution of the State. After the bonds were issued the Supreme Court of the State decided that the statutes authorizing the issue of the bonds were unconstitutional. There had been no decision to that effect prior to the issuing of the bonds. We held that the decision of the Supreme Court was not binding, and construed the constitution and statutes for ourselves, and sustained the bonds.

It was, however, said in *Burgess* v. *Seligman* that even in cases in which we may exercise an independent judgment, if the question seems " balanced with doubt," we will " lean towards an agreement of views with the state courts." But we are unable to yield that deference to the decision in *Commissioners* v. *Snuggs,* notwithstanding our respect for the learned tribunal that delivered it. We are unable to construe the code sections as having had " reference to no cases except those where the counties had an interest in unfinished railroads at the adoption of the constitution of 1868." The prohibition of the constitution was directed to the State; the power given by the code sections was directed to counties. It is easy to conceive the reasons which induced the different provisions. The State might indeed not desire to extend its general aid beyond what had been done or commenced. Local interest might be different, and the exact fulfillment of the conditions upon which aid could be granted was assured and any abuse guarded against, by requiring a vote of the people. Besides, there is no reference in the code sections to the constitution of 1868, or any retrospective implications in them. The language is that

which would naturally be employed to express a present and continuing power, to be exercised as occasion should arise. And the contemporaneous construction sustains this view. There was a vote of the people of the county authorizing the subscription, and not through all the publicity and discussion of the canvass, not in the proceedings before the board of commissioners when the subscription was made, was there an intimation expressed, as far as the record shows, that the power of the counties of the State was limited by and depended upon what existed at the date of the constitution of 1868. And for four years a tax was levied and interest paid on the bonds.

As we have seen, section 1996 confers power on the boards of commisioners of counties " to subscribe stock to any railroad company or companies, when necessary to aid in the *completion* of any railroad in which the *citizens* of the county may have an *interest*." These conditions, as we have also seen, were defined to mean, by the Supreme Court of the State, in *Commissioners* v. *Snuggs*, an interest of the county, as distinguished from the interest of its citizens, and a pecuniary interest as distinguished from that which comes from the facilities afforded by a railroad ; and the completion of a railroad to signify one begun, but not finished. These definitions may be disputed, and are disputed.

A county is in many ways a distinct legal entity from its citizens, but it is created for their benefit, and its duties and powers are conferred to be exercised for their welfare. This is true even of its ordinary and governmental functions ; it is especially true of the power to subscribe to the stock of a railroad company, and in conferring such power the predominant thought would be, not the interests of the county as such, but the interests of its citizens as such. And the language of the Code of North Carolina conforms to and exactly expresses the thought—accurately marks a distinction between the county acting through its board of commissioners and the citizens of the county, and provides that the interests of the latter shall induce the exercise of the powers and duties of the former. Such interests could not be pecuniary—could only be that which comes from the possession and advantages of railroads. And

the same consideration would seem to lead to a different definition of the word "completion" than that given by the Supreme Court of North Carolina. Of course, there can be no completion of a thing which has not been begun, but it does not follow that the legislature intended to express a distinction between railroads which could receive, according to the degree of their construction. The statute regards not actual construction but aid to construction. Its purpose is the production of a result— the building of railroads, and, it is manifest, that aid given before their commencement would be as efficient, and might be more necessary, than that given after their commencement. It is not easy to conceive what purpose would be subserved by confining the aid to roads which have been begun; and there would be certain embarrassment in deciding the degree to which construction must be advanced. However, these are but passing observations. We may rest the validity of the bonds on the right of a *bona fide* holder from their recitals to assume that the county had the interest claimed and that the railroad had been begun before subscription to its stock was made. It makes no difference whether the existence or non-existence of those conditions could have been ascertained by inquiry. Purchasers were not expected to be at or near the sources of information. The bonds were not offered in Stanly County only, or in the State of North Carolina only. They were expected to be offered in the financial markets of the other States of the Union; even offered in the financial markets of the world. They were payable to bearer. They were expected to have, and their value, to an extent, depended upon their having almost the currency and sanction of money. If a buyer of bonds is chargeable with knowledge not only of want of power to issue them, (a considerable risk, as the records of the courts show,) but also of the non-performance of conditions *in pais*, their value would be much diminished. And what good would such a holding subserve? The affairs of a county can only be administered by its officers, and to their attention and duty its interests must be entrusted. When the power to issue bonds, therefore, depends upon the existence of conditions, the local officers are charged with the duty and the responsibility of ascertaining

them, and the presumption that the duty was exercised should and does accompany and guarantee the bonds in every financial market. And this court has so decided. In *Evansville* v. *Dennett*, 161 U. S. 434, the bonds passed upon recited that they were "issued by the city of Evansville in payment of a subscription to the Evansville, Henderson and Nashville Railroad Company, made in pursuance of an act of the legislature of the State of Indiana and ordinances of the city council of said city, passed in pursuance thereof." The bonds were dated May 1, 1858. Other bonds were issued December 1, 1870, in payment of the subscription of the city to the stock of the Evansville, Carmi and Paduca Railroad Company. The recital in the latter bonds was as follows:

" By virtue of an act of the general assembly of the State of Indiana, entitled 'An act granting to the citizens of the town of Evansville, in the county of Vanderburg, a city charter,' approved January 27, 1847 ; and by virtue of an act of general assembly of the State of Indiana, amendatory of said act, approved March 11, 1867, conferring upon the city council of said city power to take stock in any company authorized for the purpose of making a road of any kind leading to said city ; and by virtue of the resolution of said city council of said city, passed October 4, 1869, ordering an election of the qualified voters of said city upon the question of subscribing three hundred thousand dollars to the capital stock of the Evansville, Carmi and Paducah Railroad Company, and said election, held on the 13th day of November, 1868, resulting in a legal majority in favor of such subscription, and by virtue of a resolution of said city council, passed May 23, 1870, ordering an issue of the bonds of the city of Evansville (of which this is a part) to an amount not to exceed three hundred thousand dollars, bearing interest at the rate of 7 per cent per annum, for the purpose of paying the subscription as authorized above." The charter of Evansville authorized the city " to take stock in any chartered company for making roads to said city. . . . *Provided*, That no stock shall be subscribed or taken by the common council in any such company, unless it be on the petition of two thirds of the residents of said city, who are freeholders of the city, dis-

tinctly setting forth the company in which stock is to be taken, and the number and amount of shares to be subscribed."

The charter of Evansville was amended in 1865, but the amendment was declared unconstitutional by the Supreme Court of the State, and another act was passed in 1867. The latter act authorized a subscription to the stock of the railroad company, when a majority of the qualified voters of the city, who were also taxpayers, should vote therefor. The ordinances of the city recited that an election was held, but did not recite that a petition of resident freeholders of the city was presented to the common council as required by the charter, and no such petition was in fact presented. The case came to this court on certificate, and the following questions were propounded: Did the recital in the first series of bonds put the purchaser upon inquiry as to the terms of ordinances under which the bonds were issued? Did the recital in the second series of bonds, those issued to the Evansville, Carmi and Paducah Railroad Company, (1) put the purchaser upon inquiry as to the terms of the resolution under which they were purported to have been issued; (2) estop the city from asserting that the bonds were not issued for a stock subscription upon a petition as prescribed by the charter; (3) " was a *bona fide* purchaser for value of the bonds issued to the Evansville, Carmi and Paducah Railroad Company charged by the recitals in said bonds with notice that they were issued in pursuance of an invalid act, and in pursuance of an election under it, or had such a purchaser a right to assume, from the recital, that the prerequisites of both the valid act and the invalid act had been observed by the common council before the issuance of such bonds?"

Sustaining the validity of the first series of bonds, the court said, by Mr. Justice Harlan, it could not be doubted that the city had the power to subscribe to the stock upon the performance of the conditions expressed in the question propounded, and further said they " were only conditions which the statute required to be performed or met before the power given was exercised. That there was legislative authority to subscribe to the stock of these companies cannot be questioned, although

the statute declared that the power should not be exercised except under the circumstances stated in the statute."

And of the effect of the recital that the subscription was "made in pursuance of an act of the legislature and ordinances of the city council passed in pursuance thereof," it was observed: "This imports not only compliance with the act of the legislature, but that the ordinances of the city council were in conformity with the statute. It is as if the city had declared, in terms, that all had been done that was required to be done in order that the power given might be exercised."

Passing on the second series of bonds and expressing the principle applicable, *School District* v. *Stone*, 106 U. S. 183, was quoted from as follows: "'Numerous cases have been determined in this court, in which we have said that where a statute confers power upon a municipal corporation, upon the performance of certain precedent conditions, to execute bonds in aid of the construction of a railroad, or for other like purposes, and imposes upon certain officers—invested with authority to determine whether such conditions have been performed— the responsibility of issuing them when such conditions have been complied with, recitals, by such officers, that the bonds have been issued "in pursuance of," or "in conformity with," or "by virtue of," or "by authority of" the statute, have been held in favor of *bonâ fide* purchasers for value to import full compliance with the statute, and to preclude inquiry as to whether the precedent conditions had been performed before the bonds were issued.' *Town of Coloma* v. *Eaves*, 92 U. S. 484; *Commissioners* v. *Bolles*, 94 U. S. 104; *Mercer County* v. *Hacket*, 1 Wall. 83; *Anderson County Commissioners* v. *Beal*, 113 U. S. 227, 238-9, and authorities there cited; *Cairo* v. *Zane*, 149 U. S. 122."

And again: "As therefore the recitals in the bonds import compliance with the city's charter, purchasers for value having no notice of the non-performance of the conditions precedent, were not bound to go behind the statute conferring the power to subscribe, and to ascertain, by an examination of the ordinances and records of the city council, whether those conditions had, in fact, been performed. With such recitals before

them they had the right to assume that the circumstances existed which authorized the city to exercise the authority given by the legislature."

In *Gunnison County Commissioners* v. *Rollins,* 173 U. S. 255, the bonds passed on recited that all the requirements of law had been fully complied with by the proper officers in the issuing of the bonds. It was held that the county was estopped from asserting, against a *bona fide* holder for value, that the bonds so issued created an indebtedness in excess of the limit prescribed by the constitution of Colorado. See also *Waite* v. *Santa Cruz,* 184 U. S. 302, where effect of recitals in bonds was thoroughly considered and the doctrine of prior cases repeated and affirmed.

The application of these cases to that at bar is denied by petitioners. The argument is (to quote counsel):

" The preliminary question, whether the railroad was incomplete or the county had an interest, was not one as to which the commissioners had peculiar knowledge, qualifying them to answer. They had such knowledge as the whole public could obtain—nothing more. It was incumbent on the respondents to inquire about the fact, because the incompleteness or completeness, or the interest of the county, was a test of the existence of the power of the board, not a condition precedent to the exercise of a power granted."

It is also said that counties having an interest were constituted a class, and only members of the class could have exercised the power conferred by the code sections. We think the distinctions made are not substantial. No matter how you may designate the interest of the county or the condition of the railroad, they were facts which bore the same relation to the power of the board of commissioners of Stanly County, as the facts in the cited cases bore to the power of the officers the exercise of which was sustained. It is indifferent whether you call the facts which were to be ascertained tests of power or conditions precedent or marks of a class. They were something which were to exist prior to the exercise of the power, and the existence of which the law imposed on the board of commissioners the duty to ascertain.

*Decree affirmed.*