**DUVAL CATTLE CO. et al. v. HEMPHILL.**

No. 5631.

Circuit Court of Appeals, Fifth Circuit.

June 3, 1930.

Rehearing Denied July 7, 1930.

434

See, also, 9 F.(2d) 81.

W. M. Bostwick, Jr., Joseph M. Glickstein, A. W. Cockrell, Jr., and Perse L. Gaskins, all of Jacksonville, Fla., for appellants.

J. Turner Butler and Giles J. Patterson, both of Jacksonville, Fla., for appellee.

Before BRYAN and FOSTER, Circuit Judges, and SIBLEY, District Judge.

BRYAN, Circuit Judge.

This is an appeal from a final decree declaring and foreclosing liens for delinquent drainage taxes on certain lands lying within the Baldwin drainage district. Appellee was appointed receiver of the district in a suit brought against it by the holders of some of its bonds, and brought this as an ancillary suit pursuant to an order of court directing him in behalf of the bondholders to enforce the collection of all unpaid and delinquent drainage taxes levied upon the lands in the district by foreclosure proceedings if necessary, and for that purpose to take possession of the delinquent tax books of the district. Krietmeyer v. Baldwin Drainage District (D. C.) 298 F. 604. The defendants, appellants here, are the Duval Cattle Company a corporation, owner of the lands involved, J. G. Boyd, and several other individuals and corporations claiming interests in the lands as stockholders of the cattle company, or under mortgages that are subordinate to the drainage bonds, unless, as is contended, those bonds are void, either because the statute under which they were issued is unconstitutional, or because its essential provisions had not been complied with in the formation and maintenance of the drainage district.

The statute in question is chapter 6458, which was enacted by the Legislature of Florida in 1913 to provide for the organization and maintenance of drainage districts, for the purpose of reclaiming wet or overflowed lands. The act as amended has been brought forward and appears as section 1451 et seq., Compiled General Laws of 1927. It provides for the formation of a drainage district by the state board of drainage commissioners, or by a majority, either in numbers or in acreage, of the owners of any contiguous body of wet or overflowed lands, or lands subject to overflow, "for the purpose of having such lands reclaimed and protected from the effects of water, for sanitary or agricultural purposes, or when the same may be conducive to the public health, convenience or welfare, or of public utility or benefit." Section 1451.

The initial proceeding prescribed for the creation of a drainage district at the instance of private landowners is a petition, which, after notice, is required to be presented to the circuit judge of the county in which the lands, or the greater portion thereof, are situated. The petition is required to state that the owners of the lands whose names are subscribed to it "are willing to and do obligate and bind the lands owned by them" to pay the drainage taxes which may be assessed. If after a hearing the court be of opinion that the lands described in the petition should not be incorporated into a drainage district, the proceedings are to be dismissed; but the court, if it be of opinion that the proposed drainage district "will be for the advantage of the owners of the real property therein or that the same would be in the interest of the public health, convenience or welfare" (section 1453), shall enter an order declaring the drainage district to be a public corporation of the state. Upon the entry of an order of incorporation, a meeting is to be called of all the owners of land in the district, for the purpose of electing from among their number a board of three supervisors.

Upon being elected, the board of supervisors is to select an engineer whose duty it becomes to make a survey, determine what lands will be improved or reclaimed by drainage, make an estimate of the cost of carrying to completion the plan of reclamation, and submit a written report which after adoption

by the board is to be known and designated as "the plan of reclamation." After this plan of reclamation is filed in the clerk's office, the circuit judge who incorporated the district is to appoint commissioners to appraise the lands and assess the benefits that will accrue to each governmental lot, 40-acre tract, or other subdivision according to ownership. Public highways, railroads, and other rights of way are to be assessed according to the increased efficiency and decreased maintenance cost of roadways resulting from the proposed works and improvements. The commissioners are also to make a report of their findings, which, after notice, is required to be submitted to the court which passed upon the original petition. If it appear after a hearing that the estimated cost of construction, according to the plan of reclamation, will be less than the benefits assessed against the lands in the district, it is provided that the court shall enter an order approving and confirming the report of the commissioners. After the list of lands, the report showing the assessed benefits, and the last-mentioned decree and judgment of the court have been filed in the clerk's office, the board of supervisors are required to levy a tax sufficient to pay the total cost of the completion of the proposed plan of reclamation, and in addition 10 per cent. of the total amount for emergencies. The taxes are to be apportioned on each tract of land in proportion to the benefits assessed, and not in excess thereof, and, in case bonds are issued, the interest thereon shall be added to the taxes. The board of supervisors is also required, during each year of the existence of the district, to determine and levy the amount of the annual installments of the total taxes. Drainage taxes are declared to constitute liens, to which only the liens of the state for general state, county, school, and road taxes are paramount, upon all lands against which they are required to be levied. The county tax collector of each county in which the lands of any drainage district are situated is required to collect delinquent as well as current drainage taxes, and the board of supervisors is required to select a treasurer who shall receive and receipt for all drainage taxes so collected. The collection of delinquent drainage taxes may also be enforced in a suit by and in the corporate name of the district; and, if the district fail to bring suit within ninety days after such taxes have become delinquent, the holder of any bond issued by the district is given the right "to bring suit for the collection of delinquent taxes."

The board of supervisors is authorized to apply to the court to amend or change the plan of reclamation, and the procedure, in the event an order of court be granted permitting the change, is the same as is prescribed for the original appraisal of the lands and assessment of benefits. The board of supervisors is also authorized to issue bonds not to exceed 90 per cent. of the total amount of the taxes, and these bonds are required "to show on their face the purposes for which they are issued, and shall be payable out of money derived from the aforesaid taxes." By an amendment adopted in 1923, chapter 9129, it is provided that, if any bond or interest coupon be not paid within sixty days after maturity, a court of competent jurisdiction, on the application of the holder of such overdue bond or interest coupon, may appoint a receiver for the drainage district with authority to collect drainage taxes and to bring suit to foreclose drainage tax liens, provided that, when all overdue bonds and interest have been paid the receiver shall be discharged and the affairs of the district shall again be conducted by its board of supervisors.

The Baldwin drainage district was organized in 1916 in the manner prescribed by chapter 6458. Its outside boundaries take in township 2, south of range 23 east, and townships 2 and 3, south of range 24 east, containing all told, 68,868 acres. The two northern townships are traversed by two railroad lines which extend in a general easterly and westerly direction, but cross each other near the western boundary, and by a third railroad line running north and south which crosses the other two. Because of these several railroad rights of way and crossings, which take up altogether 620 acres, appellants contend that the district is made up of seven tracts of noncontiguous land. The original petition excluded these railroad rights of way and represented that the remaining 68,248 acres, which were included therein, constitute a contiguous body of land, and they were declared to be contiguous by the order of court establishing the drainage district. It was also alleged in the original petition, and declared by the decree of the court, that the drainage and reclamation of this body of land would be for the advantage of the owners of the land, and also conducive to public health, convenience, and welfare, and of public utility and benefit. The total cost of the project was estimated at $304,000, and the total benefits to accrue were estimated at upwards of $2,300,000. After the district was organized, and benefits

were assessed, the board of supervisors sold three issues of district bonds. The first issue was for $300,000, the second for $150,-000, and the third for $110,000. The second and third issues were found to be necessary because of increases in the cost of construction. It appears from the minutes of a meeting of the landowners held in 1926 that the proceeds from all three bond issues had not been sufficient to reclaim all the lands, and that more canals than were provided for in the plan of reclamation would be necessary to carry off flood waters that accumulated on 4,000 acres in one of the townships.

The bonds are in statutory form, and are now in the hands of subsequent holders for value and without notice. They were originally accepted and taken by the construction contractors in payment for work done under contracts which did not call for the completion of the plan of reclamation, but provided only for the digging of ditches and canals on the piece basis, or at so much per yard of excavation. As each bond issue was put out, the total assessments to take care of principal and interest were made, and annual installments required by the statute were levied to raise taxes during the years here involved. J. G. Boyd was one of the signers of the petition for the creation of the district, and was the largest landowner in it, his holdings amounting to 18,711 acres. He was continuously chairman of the board of supervisors during the period here involved, and approved everything that was done in the management of the district's affairs, including the issuance of bonds. After the district was organized, he conveyed all his land except about 2,000 acres, or 16,695 acres, to the Duval Cattle Company, of the capital stock of which he owned 1,489 out of 1,500 shares outstanding. After the Duval Cattle Company was incorporated, he assigned some of his stock in it, and conveyed to others all his remaining lands except 240 acres, but he acted as spokesman for that company at all meetings of landowners and of the board of supervisors. The Duval Cattle Company continued to own at the date of the decree the land conveyed to it by Boyd.

The bill of the bondholder in the main suit alleged the three issues of bonds and the default of the district. In this ancillary suit, the receiver appointed in the main suit seeks to exercise the right of collection given by the amendment of 1923 as against the lands of the Duval Cattle Company, whose taxes it is alleged had become delinquent for several years. It was alleged in the answer of that company, in support of its theory that the taxes assessed against it were null and void, that the board of supervisors, without filing a petition and without obtaining the necessary authority, as prescribed by the statute, had made changes in the official plan of reclamation; that these changes "consisted in providing for ditches and canals not provided for by said original plan of reclamation, by omitting ditches and canals provided for in said official plan of reclamation, and by changing the location of ditches provided for in said official plan of reclamation." On appellee's motion, this part of the answer was stricken. The Duval Cattle Company also entered a plea of payment of its delinquent taxes, but the District Judge rejected that plea upon evidence which was to the effect that a check drawn against time certificates of deposit which did not mature for a year was accepted as payment by the board of supervisors. The district's secretary received that check and issued tax receipts, but its treasurer refused to indorse the check or to accept the certificates of deposit in payment, and the bank upon which the check was drawn and which issued the certificates of deposit failed a few days later.

Appellants assign error and contend here that the decree is erroneous on the grounds: (1) That chapter 6458, Laws of Florida (1913), pursuant to which the Baldwin drainage district was organized, is unconstitutional, in that the Legislature had no power to authorize the formation of a drainage district merely for the advantage of owners of real property therein, could not delegate its admitted power to establish a drainage district in the interest of public health, convenience, or welfare, and above all could not delegate such power to a state court, because article 2 of the State Constitution divides the powers of government into three departments, executive, legislative, and judicial, and prohibits a person belonging to one of those departments from exercising any power appertaining to either of the others; (2) that chapter 6458, if it be constitutional, was not complied with in the formation of the drainage district, in that the lands included in it were not contiguous, but were separated by railroad rights of way which were excluded, thus causing the district to be made up of seven tracts of noncontiguous lands; (3) that the amendment to chapter 6458, adopted in 1923, purporting to authorize the appointment of a receiver, is not by its terms applicable to past transactions, but, if it be so considered, that the order appointing a receiver was void, because it authorized the

usurpation of official duties conferred upon county tax collectors, and was unnecessary, since the original statute affords a complete remedy to bondholders in the event the landowners in the district fail to pay drainage taxes assessed for the purpose of meeting payments due upon the bonds; (4) that the bonds were nonnegotiable, and were accepted originally in payment for constructing the ditches and canals necessary to drain the lands by contractors who it was not alleged or proven had complied with their contracts, with the result that appellants had a good defense against the original bondholders which they were entitled to assert in a suit to collect upon the bonds brought by appellee as receiver in behalf of subsequent bondholders who bought without notice of any breach of the construction contracts; (5) that the portion of the cattle company's answer which alleged that the original plan of reclamation had been unlawfully changed presented a good defense, and should not have been stricken, as it was on appellee's motion; (6) and finally, that the drainage taxes, for the collection of which it was sought to establish a lien upon the lands involved, had been paid.

The Florida drainage statute under attack does not differ in principle from the drainage statutes of many of the states. 19 C. J. 608. It is very similar in its main features to the earlier Missouri drainage statute, which was upheld in Mound City Land & Stock Co. v. Miller, 170 Mo. 240, 70 S. W. 721, 60 L. R. A. 190, 94 Am. St. Rep. 727.

One of its declared purposes is to reclaim lands subject to overflow so as to make them fit for agricultural purposes. It is no objection that private owners of the lands would also be benefited. It is well settled that the lands of such owners may be assessed in proportion as they are benefited. The Legislature, by authorizing the establishment of drainage districts and assessments against property specially benefited upon compliance with the terms and conditions which it prescribes, did not delegate its legislative power. Hagar v. Reclamation Drainage District, 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569. A compliance with these conditions precedent but gives effect to the legislative will.

Whether in any given instance there has been such compliance is always a question of fact. To require the submission of a question of this nature to a court for its determination is not to confer upon it either legislative or executive power. This Drainage Act confers upon the courts the power, not to create a drainage district, but merely to decide and declare whether one has been created in ac-

cordance with its provisions. Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 178, 17 S. Ct. 56, 41 L. Ed. 369. In Pinellas Park Drainage District v. Kessler, 69 Fla. 558, 68 So. 668, it was held that the Legislature had the power under this same act to authorize a board of supervisors to make assessments.

That decision did not specifically deal with the constitutionality of other provisions. In State ex rel. Young v. Duval County, 76 Fla. 180, 79 So. 692, the power of the court to approve or disapprove tolls proposed by the board of county commissioners to be charged for passage over the St. Johns river bridge at Jacksonville was upheld. That case is sought to be distinguished from this by the argument that it was a rate case. But the judicial power over rates extends no further than to determine whether or not they are fair and reasonable. The point decided was that the court had not usurped power that belonged to the legislative or the executive department. At the time of the issuance of these bonds, chapter 6458 had not been declared unconstitutional by any reported Florida decision. The two decisions last above cited would seem to be authority in support of the view that that act was passed in the valid exercise of legislative power.

In Burnett v. Green, 97 Fla. 1012, 122 So. 570, decided since the bonds were issued and the decree appealed from was entered, the constitutionality of chapter 6458 was directly challenged on the ground that it was an attempt to confer legislative power upon the judicial department. Two of the six justices were of opinion that it was unconstitutional upon the ground that the creation of a drainage district was a legislative and not a judicial function; two other justices concurred in affirming a temporary injunction issued by the trial court restraining the collection of the annual drainage taxes on the ground of fraud in the creation of the district and in the issuance of bonds; the remaining two justices dissented, because in their opinion an attack upon the legal existence of the district could only be tested in quo warranto proceedings brought by the state. It cannot therefore be said that the Supreme Court of Florida, by a decision concurred in by a majority of its members, has yet held that the act is unconstitutional, but, if it could be, the decision in Burnett v. Green would not be binding upon federal courts on the question of the validity of bonds that had been issued and sold before it was rendered. Authoritative decisions of state

courts construing their own Constitution, rendered prior to the issuance of the bonds, would be controlling, but, if they were not rendered until after the bonds were issued, they are merely persuasive, and do not take away from federal courts the duty to exercise an independent judgment. Burgess v. Seligman, 107 U. S. 20, 2 S. Ct. 10, 27 L. Ed. 359; Carroll County v. Smith, 111 U. S. 556, 4 S. Ct. 539, 28 L. Ed. 517; Barnum v. Okolona, 148 U. S. 393, 13 S. Ct. 638, 37 L. Ed. 495; Folsom v. Township Ninety-Six, 159 U. S. 611, 16 S. Ct. 174, 40 L. Ed. 278; Stanly County v. Coler, 190 U. S. 437, 23 S. Ct. 811, 47 L. Ed. 1126.

■ The lands that may be included in a drainage district must be contiguous. Separate tracts of land are excluded. The statute, by requiring the owners of contiguous wet or overflowed lands to contribute in proportion to benefits, created a valuable equitable right that could not exist without it, in that it enabled the majority of landowners who were willing to bear their share of the expense of reclamation to compel the unwilling minority also to bear their share of such expense. Bearing in mind the evident purpose of this important statutory provision, we think that contiguous lands are those that are adjacent or adjoining, 13 C. J. 110; and that a solid body of land is not rendered noncontiguous by the fact that it is crossed by a highway or a railroad. The terms of the statute would have been strictly complied with if the railroad rights of way had been included and then not assessed if they were not benefited. The fact that the roadbeds were left out of the petition amounts to an acknowledgment on the part of the petitioners that they ought not to have been assessed; and the petitioning landowners, by representing that the lands included in the district were contiguous, cannot now be heard to say that they were not. Each of the subscribers to the petition bound his lands to pay their due proportion of the drainage taxes. Boyd was one of the signers, and the Duval Cattle Company took the lands involved subject to the obligations which he had placed upon them. Besides, the order of the court which declared the lands to be contiguous cannot be attacked collaterally in this suit by any landowner.

■ The amendment of 1923 authorizing the appointment of a receiver did not take away from appellants or give to the bondholders any rights in addition to those that existed under the original act. It was not void, but merely expanded a remedy that existed from the beginning. By its very terms it became effective before this suit was brought. The original act, though it required the county tax collectors to collect delinquent drainage taxes, also conferred upon the drainage district the right to enforce tax liens, and, in the event, the district should fail to enforce collection, also conferred the same right upon the bondholders. There was therefore no usurpation of official duties.

■ The bonds are negotiable in form, and in our opinion are not rendered nonnegotiable by the requirement of law that they should be payable out of money derived from drainage taxes.

The promise of the district to pay was unconditional, though it is true that its only source of revenue was taxes. But it pledged all its taxes, all its assets. It can hardly be doubted that it was the intention of the Legislature to make the bonds negotiable. The cases of United States Mortgage Co. v. Sperry, 138 U. S. 313, 11 S. Ct. 321, 34 L. Ed. 969, and Moore v. City of Nampa, 276 U. S. 536, 48 S. Ct. 340, 72 L. Ed. 688, cited and relied on by appellants, are not in point, as in each of them the promise was to pay out of a portion only of total assets or taxes. But if the bonds are nonnegotiable, the result must be the same. There is here no proof that any fraud was perpetrated by the contractors. Their contracts did not call for the completion of the plan of reclamation, and, so far as appears, were fully performed. The part of the answer that was stricken alleged, not a material change in the plan of reclamation, but rather that such plan was not carried out in complete detail because of omissions and substitutions of canals.

■ The annual tax assessment rolls were offered and received in evidence without objection, but it is sought to be urged here for the first time that they were unintelligible or not self-explanatory. Such objections cannot be considered here for the first time, since they are such as might have been removed by testimony in the court below. Total assessment rolls were also objected to on the ground that certain lands were not assessed, but such lands are marked "N.B.," the meaning of which could have been ascertained without difficulty, and, as suggested by appellee's counsel, doubtless is "no benefits" or "not benefited." The irregularities are such as are cured by section 24 which provides that no mere informality or irregularity in assessments shall be a valid defense.

■ The plea of payment was not sustained by the evidence, as the board of supervisors

had no authority to accept anything in payment except cash or its equivalent. The effect of what was done was to accept a promise to pay at the end of a year.

The decree is affirmed.