## CITY OF SANFORD, FLA., v. CHASE NAT. BANK OF CITY OF NEW YORK.

### No. 394.

Circuit Court of Appeals, Second Circuit.
June 8, 1931.

Charles A. Boston, of New York City (James H. Caldwell, of New York City, Lucien H. Boggs, of Jacksonville, Fla., and Mark F. Hughes, of New York City, of counsel), for appellant.

Rushmore, Bisbee & Stern, of New York City (Henry Root Stern, H. G. Pickering, James F. Sandefur, and Bertram F. Shipman, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

This suit seeks the surrender and cancellation of three alleged certificates of indebtedness of the plaintiff, a municipality of Florida, in the amount of $600,000, because, it is claimed, they were executed without authority, by the mayor and city clerk, and were negotiated by the mayor without authority and without consideration. Defendant, a New York City bank, claims it holds these certificates as collateral for two notes issued by the Seminole County Bank of Sanford, Fla., now insolvent, the amount of which was over $500,000. The plaintiff further asks to enjoin the defendant from selling or disposing of unsold negotiable bonds it now possesses, amounting to $740,000, which the defendant claims to hold as addi-

tional collateral to the bank's notes. Plaintiff claims these bonds came into defendant's hands unlawfully, and it asks for the surrender of such bonds. This latter relief, the surrender of the bonds, was granted below, and the defendant appeals. The plaintiff was denied the first relief, and it appeals. Defendant interposed nine counterclaims, on the certificates, for money had and received, and money paid for the use and benefit of the plaintiff, in the sum of $500,000. Money judgment for $450,000 was granted the defendant. Plaintiff seeks a review of this judgment.

Plaintiff was organized under a special act of the Legislature of Florida, which is now its city charter, chapter 9897, Sp. Laws of Florida, 1923, as amended. All legislative and executive powers of the city, material here, are vested in a city commission consisting of three members. The commission is obliged to hold regular meetings, keep minutes and records. The city ordinances and resolutions must be written or printed and recorded in a book kept for that purpose. By section 57 of the charter, the members of the city commission are ex officio trustees of the sinking fund of the city, with "duties and powers and responsibilities imposed by ordinance of the City of Sanford or by any law on any board of bond trustees now existing or that may have been heretofore elected." The duties and powers of the bond trustees are to act as trustees of such funds as may be issued from time to time for legally authorized municipal purposes; they must advertise for sale and sell all city bonds or reject bids therefor. A majority constitutes a quorum. Moneys arising from such sale of bonds are to be placed in a depository to be drawn only by checks signed by two members of the board of trustees and countersigned by the president of the council.

The legislative and executive powers of the city are vested in the commission as a whole, not in individual members. The mayor is elected by the city commission. He has no sole legislative or executive power as such. Section 22 of the City Charter provides: "Every ordinance or resolution shall, upon its final passage, be recorded in a book kept for that purpose and shall be authenticated by the signature of the presiding officer and the Clerk of the Commission. Every ordinance of a general or permanent nature shall be published once within ten days, after its final passage, in nonpareil type."

The charter further provides for a city attorney whose duties are to act as legal ad-

viser to the municipality and its officers in matters relating to their official duties. He may be required to give an opinion on any questions of law relating to these duties. The city's power to borrow money and to issue bonds is provided by the city charter. As to the power to issue bonds, section 106 provides that street improvement bonds may be issued "to an amount not exceeding seventy per cent. of the proportionate part of the cost of said street improvements * * * and said bonds shall be issued upon the adoption of a resolution by the City Commission providing for the issue thereof without submitting the question as to the issuance of said bonds to a vote of the electors of said municipality."

Section 107 provides: "After the levy of special assessments for street improvement stand confirmed, and after the completion and acceptance of said improvement by the City Commission, the City Commission may, by resolution, issue further bonds * * * to an amount not exceeding the unpaid assessments for said street improvement; provided, however, that if any bonds have been issued under the preceding section, upon an estimate of the cost of the improvement, the bonds issued under the preceding section and the bonds issued under this section shall not in the aggregate exceed the amount of the unpaid assessments."

And section 119, as amended (Laws 1925, Ex. Sess., c. 11719), provides for the issuance of bulkhead bonds, and authorized that they be issued by resolution of the city commission providing for the issue thereof without submitting the question as to the issuance of said bonds to the vote of the electors of the municipality.

And section 123 (as amended by Laws Fla. 1925, Ex. Sess., c. 11718) provides: "The City Commission in its corporate capacity is authorized to issue from time to time bonds * * * for any and all municipal purposes mentioned in this Act, and for such other lawful purposes as may be determined by ordinance; provided, however, that (except as otherwise provided in this Act) before the issue of any bonds shall be made, an ordinance shall be passed expressing in exact terms the amount of the bond issue and purpose for which moneys to be realized are to be used, which said ordinance proposing the issue of bonds shall subsequently be approved by a majority vote of the electors of the city, * * * voting at an election held for that purpose, at such time and in such manner as may be prescribed by law and the city ordinances."

Section 123 (A) provides for the issuance of negotiable public utility bonds which is limited in like manner to section 123 just quoted. Section 123 (E) provides that "any and all negotiable bonds * * * shall be advertised for sale on sealed bids which advertisement shall be published" (in a specified manner), and it is provided that, if any bonds be not sold pursuant to such advertisement, they may be sold at private sale at any time within sixty days after the date advertised for the reception of sealed bids. There is no provision of the charter which sanctions the issuance of certificates of indebtedness either as negotiable or nonnegotiable. But defendant argues they are on the same basis as bonds.

The Seminole Bank is a state institution incorporated with a capital and surplus of $125,000. It became insolvent August 6, 1927, at which time a receiver was appointed. The mayor of the city of Sanford was also the president of the bank at the times herein referred to, which fact was well known to the defendant. The city maintained accounts in the bank for current funds, and others for capital funds of the bond trustees. The books of account of the bond trustees were kept in the Seminole Bank by its cashier, who was not employed by the city. The Seminole Bank and defendant for some years had carried on business relations.

On November 8, 1926, the Seminole Bank executed its promissory note payable to the defendant for $300,000 maturing February 7, 1927, with the personal indorsement of the mayor. The note recited as collateral a negotiable certificate of indebtedness of the plaintiff in the same amount, bearing 6 per cent. interest payable quarterly. The certificate was payable to the order of the Seminole Bank, and executed in the city's name by the mayor, and attested under the corporate seal by the city clerk. The city minute and resolution books failed to disclose any authority for the execution of this certificate. The other two members of the city commission did not know of the issuance of the certificate prior to July, 1927. The city attorney, on November 8, 1926, furnished an opinion to the president of the bank, to be submitted to the state bank examiner, certifying to the legality of these certificates of indebtedness. This letter was sent to the defendant. The vice president of the Seminole Bank, by letter on the same day, directed the defendant

to charge the Seminole Bank with "the demand note for $100,000 which you now hold when the $300,000 note has been credited." According to the defendant's letter of November 10, 1926, this was done. The $100,000 was paid, not as an obligation of the city, but as a demand loan made by the defendant to the Seminole Bank. The letter of the city attorney was legally inefficacious. The opinion was not given, as the charter provides, to any officer of the city, and was expressed in the face of want of power of the plaintiff to issue this evidence of indebtedness. Town of Bithlo v. Bank of Commerce, 92 Fla. 975, 110 So. 837. The certificate bore the unrestricted indorsement of the Seminole Bank.

On December 27, 1926, two additional collateral notes were executed by the Seminole Bank to the defendant, one for $100,000, and the other for $200,000. They were indorsed by the president of the bank. And two certificates of indebtedness of the plaintiff, one for $100,000, and the other for $200,000, were given as collateral. Both were payable March 27, 1927. They bore the unrestricted indorsement of the Seminole Bank. No record of municipal authority for issuing these was found. The other two members of the commission did not know of their execution or delivery until July, 1927. On November 8, 1926, the date of the issuance of the first certificate, the bond funds available in the Seminole Bank were $1,209,418.15, and on December 30, 1926, when the other two were delivered, $967,539.23, indicating no requirement for issuing the certificates in question. When these last two notes were discounted by the defendant, credit for them was given to the Seminole Bank. The memorandum issued therefor contains no reference to the plaintiff. Renewals of the notes were given from time to time on request of the Seminole Bank, but no new certificates of indebtedness were substituted for those which had matured. It is clear that the defendant accepted these notes and advanced its money without evidence of proper municipal authority.

An account was opened by the mayor in the Seminole Bank, known as the "Bond Trustees' 6% Savings Account," and this was unknown to the other commissioners. The city auditor found that the city did not receive the benefit or consideration of the transactions which involved the three certificates of indebtedness in controversy. There was no consideration given therefor. It resulted only in the opening of an account as above; no checks were drawn against it, and there were no offsets against it except an item of $100,000 paid out of the very entries which produced the account, and there were no entries paid or received upon the books.

■ The court below held that the plaintiff was estopped to deny the validity of these certificates. Section 1898 of the Revised General Statutes of Florida of 1920 provides that the city or town council shall have power, with approval of the voters, to borrow money. Section 1899 authorizes the issuing of bonds for any municipal purposes. The plaintiff was a municipality governed by a commission with duties and powers expressly prescribed. Such authority is exclusive.

■ These certificates were not issued under section 7 of the charter for current expenses. The defendant knew they were for improvements and not for current expenses. If they be held valid as negotiable securities, they must be valid as bonds within the provisions of the city charter. Section 123 authorizes issuing bonds for the general municipal purposes mentioned in the charter and such other lawful purposes as may be determined by ordinances. It requires confirmation by a majority vote of the qualified electors. When bonds are negotiable, they are to be advertised for sale. If these certificates are not bonds, they are invalid; if they are equivalent to negotiable bonds, they are invalid, since they were not offered for sale, as required by section 123(E) of the charter, nor were they advertised as required. To sell on sealed bids, and after advertising, meets the full need of the plaintiff's credit. The defendant concedes the certificates were negotiable. Board of Com'rs of City and County of Denver v. Home Savings Bank, 236 U. S. 101, 35 S. Ct. 265, 59 L. Ed. 485.

■ There is no recital that deceived the bank into believing that section 123(E) had been complied with and that sealed bids had been asked for by advertising. The bank, in accepting these certificates, knew there had been no sealed bids or advertising as required. Moreover, the defendant knew the certificates were issued to finance the city's improvements temporarily, until the issue of bonds provided for in the resolution were sold and funds became available. The correspondence between the plaintiff's mayor and the vice president makes it clear that the defendant was taking the certificates whenever the city needed the money, simply assuming that it would be repaid from the proceeds of the bonds sold. They knew that

the requirement of advertising had not been fulfilled. Some of these bonds were sent at intervals of one week apart. The advertisement of bonds was referred to in the letter which accompanied the second certificate. The purchasers of municipal securities are charged with knowledge of the provisions of law governing their issuance. Dixon County v. Field, 111 U. S. 83, 92, 4 S. Ct. 315, 28 L. Ed. 360; Ogden v. County of Daviess, 102 U. S. 634, 641, 26 L. Ed. 263; Crow v. Oxford, 119 U. S. 215, 221, 7 S. Ct. 180, 30 L. Ed. 388; Barnett v. Denison, 145 U. S. 135, 139, 12 S. Ct. 819, 36 L. Ed. 652. The purchaser of bonds may not rely upon the recitals therein of compliance with statutory formalities when he knows the contrary to be true. Chaffee County v. Potter, 142 U. S. 355, 364, 12 S. Ct. 216, 35 L. Ed. 1040. And the defendant here may not say that it believed the certificates had been advertised for sale unless the statutes requiring public bidding had been complied with. Roberts & Co. v. Taft, 109 F. 825 (C. C. A. 6); Richardson v. Grant County, 27 F. 495 (C. C. Dist. Ind.).

In the course of the business between the defendant and plaintiff, through the Seminole Bank, it had been the practice, as soon as a certificate was given to it, to charge the account of the proceeds from the sale of the bonds with the face of the certificate and with certificate and interest when it became due. It is thus clear that the bank knew the certificates had not been offered for sale. There can be no estoppel against the plaintiff here grounded on the defendant's ignorance of the charter's provisions. Dixon County v. Field, 111 U. S. 83, 4 S. Ct. 315, 28 L. Ed. 360; Sutliff v. Lake County, 147 U. S. 230, 13 S. Ct. 318, 37 L. Ed. 145.

■ Moreover, there are no recitals in these certificates which might change the application of this principle. Presidio County v. Noll-Young Bond & Stock Co., 212 U. S. 58, 29 S. Ct. 237, 53 L. Ed. 402; Stanly v. Coler, 190 U. S. 437, 23 S. Ct. 811, 47 L. Ed. 1126; Gunnison County v. Rollins, 173 U. S. 255, 19 S. Ct. 390, 43 L. Ed. 689; Chaffee County v. Potter, 142 U. S. 355, 12 S. Ct. 216, 35 L. Ed. 1040. In Katzenberger v. Aberdeen, 121 U. S. 172, 7 S. Ct. 947, 949, 30 L. Ed. 911, the court said: "The recital, therefore, in its present form, is of matter of law only, because it implies the existence of no special facts affecting the case, except the issue of the bonds under the ordinance to pay the subscription to the stock without any vote of the electors to be taxed therefor. It is in effect nothing more than a recital that bonds issued under such circumstances were 'under and pursuant' to law and the charter of the city. Such a recital does not estop the city from asserting the contrary. To hold otherwise would be to invest a municipal corporation with full legislative power, and make it superior to the laws by which it was created. Dixon County v. Field, 111 U. S. 92, 4 S. Ct. 315, 28 L. Ed. 363."

■ Nor does the letter of the city attorney work an estoppel. It was no part of his duty to render an opinion to be used by the Seminole Bank for its purposes. His opinions are authorized only to be given to city officials.

■ Nor can the city be estopped from denying that the mayor and the city clerk were vested by the charter with power to borrow money for the municipality or to determine the facts necessary to authorize it to borrow money or to issue negotiable paper as evidence thereof. The resolutions of August 5, 1925, and February 8, 1928, did not delegate such power to the mayor of the city and the city clerk. Indeed, the certificates which were issued departed from the resolution of the city commission which referred only to time warrants. Admitting that the resolutions authorized the mayor and the city clerk to prepare proper recitals in the certificate of indebtedness, they did not profess to give the mayor authority to keep outstanding a fund of $450,000; if anything, they were limited to temporary financing of bond issues specially mentioned in the resolution. When the mayor undertook to make recitals in later certificates, he did not look to those resolutions, nor did he look to the provisions in the charter, for there were none that empowered him to issue other certificates or to make any recitals in them.

The authority which is given by the general statutes of Florida (section 1902, Rev. Stat. Fla. 1920) gives authority to the mayor and town clerk to sign bonds, but this statute is not applicable to a city governed by a commission. The section is qualified by section 1899 and section 1901 of the Revised General Statutes of Florida 1920. Section 1901 does not apply because it is limited to cities having no special charter, and section 1899 refers to city or town councils and to bonds authorized by two-thirds of the electors who reside, own realty, and pay taxes in the city. Section 123 of this city's charter requires only a majority of the voters. They

or the clerk could not sign bonds without authority from the commission.

While the commission might depute to the mayor and the clerk the duty of signing and delivering bonds; it could not delegate to them the power to determine whether the legally prerequisite conditions had been complied with. It could only authorize them to make recitals of its determinations. In accepting the bond executed by them, the purchasers ran the risk of the existence of such authority. Rondot v. Rogers Township, 99 F. 202 (C. C. A. 6). Recitals authorized by the body charged with the issuance of the bonds can alone be binding. Town of Aurora v. Gates, 208 F. 101, L. R. A. 1915A, 910 (C. C. A. 8); Town of Newbern v. Nat. Bank, 234 F. 209, L. R. A. 1917B, 1019 (C. C. A. 6); Dixon County v. Field, supra.

The commission had given no actual authority to execute these certificates. The authority conferred by the resolutions of August 5, 1925, and February 8, 1926, even if it did include such certificates of indebtedness, had long since been exhausted, and the statutory powers of the mayor and the city clerk did not extend to the making of the recitals in bonds. The authority conferred by section 22 of the charter to authenticate ordinances and resolutions cannot be taken to mean that the mayor and clerk may also sign bonds. It would seem to exclude such authority. The mayor cannot execute bonds without authority from the commission or bind it by the recital he makes in them. Municipal bonds executed by the properly authorized officials will estop the municipality as against bona fide holders for value of the bonds from asserting that necessary conditions precedent to the issuance of the bonds have not been fulfilled. Knox County v. Aspinall, 21 How. (62 U. S.) 539, 16 L. Ed. 208; Waite v. Santa Cruz, 184 U. S. 302, 22 S. Ct. 327, 46 L. Ed. 552; Presidio County v. Noel-Young Bond Co., 212 U. S. 58, 29 S. Ct. 237, 53 L. Ed. 402. But, if the municipality has no statutory power to issue the bonds under any possible situation of facts, it cannot be estopped by any recitals in them from setting up its lack of power. Northern Nat. Bank v. Porter Township, 110 U. S. 608, 4 S. Ct. 254, 28 L. Ed. 258; Merrill v. Monticello, 138 U. S. 673, 11 S. Ct. 441, 34 L. Ed. 1069. And at bar it appears that the mayor and city clerk who executed the certificates of indebtedness were not authorized to make recitals binding on the city. Moreover, the bank was not a bona fide holder entitled to rely upon such recitals.

With full knowledge either known or easily ascertainable of the requirements of this city charter, the plaintiff advanced these moneys to the Seminole Bank on its notes, and believing the same to be for the plaintiff's use, expecting to be reimbursed from the sale of the bonds which it expected to sell. But, to impose liability on this municipality, the law requires that the provisions of the city charter be complied with when it borrows money. With such lack of power in the mayor to bind the city with respect to these certificates of indebtedness, none may be implied by his action. The recitals made in the certificate cannot in any way be regarded as an estoppel against the city, for the mayor lacked power to make such representations. Therefore the certificates of indebtedness must be surrendered and may be canceled by the plaintiff. The bonds on which the bank claims a lien are clearly invalid, and the court properly ordered their surrender to the plaintiff.

The defendant's counterclaim accordingly falls. The decree will be modified, striking out the money judgment entered against the plaintiff, and directing a surrender and cancellation of the certificate of indebtedness as well as the bonds.

Decree modified.