## RORICK et al. v. BOARD OF COM'RS OF EVERGLADES DRAINAGE DIST. et al.

District Court, N. D. Florida.
April 13, 1932.

1050

BRYAN, Circuit Judge, dissenting in part.

See also 27 F.(2d) 377.

William Roberts, of New York City, and Watson & Pasco & Brown, of Pensacola, Fla., for plaintiffs.

Evans & Mershon, of Miami, Fla., George C. Bedell, of Jacksonville, Fla., Carter & Yonge, of Pensacola, Fla., and H. E. Carter, Asst. Atty. Gen., and Marvin C. McIntosh, of Tallahassee, Fla., for defendants.

Before BRYAN, Circuit Judge, and SHEPPARD and STRUM, District Judges.

STRUM, District Judge.

This is a suit in equity in which bondholders of Everglades drainage district seek injunctive relief against the board of commissioners of said district, the trustees of the internal improvement fund of Florida, and other officers, to restrain the effectuation by those officers of parts of chapter 13633, Laws of Florida, Acts of 1929, and parts of chapter 14717, Acts of 1931, which plaintiffs assail as impairing the obligation of their bond contracts, contrary to the United States Constitution, article 1, § 10, and as denying them due process and equal protection contrary to the Fourteenth Amendment.

Pursuant to the Act of Congress of September 4, 1841, § 8 (43 USCA § 857), Florida received 500,000 acres of land for internal improvements upon her admission to the Union, March 3, 1845. Pursuant to the Swamp Lands Act of September 28, 1850, §§ 1–4 (43 USCA §§ 982–984), Florida has received patents to more than 20,000,000 acres of swamp and overflowed lands. Grants to the state under the latter act were subject to the proviso that such lands and their proceeds should be exclusively applied by the state as far as necessary to the reclamation thereof by means of levees and drains.

By chapter 610, Laws of Florida, approved June 6, 1855, the unsold portions of the internal improvement lands above men-

tioned, and the swamp and overflowed lands patented under the act of 1850, together with the proceeds of prior sales thereof, were constituted a separate fund known as the internal improvement fund. The governor and four other state officers were thereby constituted, and are still, ex officio statutory trustees of the fund, in whom title to those lands is vested until sold or conveyed under legislative authority.

By chapter 610, Acts of 1855, these trustees are charged with the duty, pursuant to the proviso of the congressional act of 1850, to make such arrangements for the drainage of the lands as is most advantageous to the fund and the settlement and cultivation of the lands. They have authority to sell and convey the lands, and it is their duty to apply the proceeds to the purposes of the fund as may be provided by law. Chapter 610, supra, is still in force. See section 1384 et seq., and sections 1401, 1408, Comp. Gen. Laws Fla. 1927; Trustees Internal Improvement Fund v. Root, 63 Fla. 666, 58 So. 371.; Trustees of Internal Imp. Fund v. Root, 59 Fla. 648, 51 So. 535.

Pursuant to the Swamp Lands Act of 1850, supra, one patent known as Everglades patent No. 137 (Hardee v. Horton, 90 Fla. 452, 108 So. 189, 191) was issued to the state of Florida, granting unsurveyed swamp lands of an estimated area of nearly 3,000,000 acres, which lands became a part of the internal improvement fund under chapter 610, supra, and subject to the statutory uses and purpose of that fund. These lands lie in an integrated area on or contiguous to the shores of Lake Okeechobee, reclamation of which lands presented unusual problems peculiar to the locality.

Reclamation by drainage of these and adjacent lands, some held by the trustees of the internal improvement fund under chapter 610, supra, and some vested in private ownership, was undertaken, pursuant to legislative enactment, as a separate enterprise by establishing the Everglades drainage district, so that the limited funds available to the trustees of the internal improvement fund from the sale of the public lands in the Everglades area could be augmented by special assessments upon all lands in the district which were benefited by the drainage improvements (except school lands, see Southern Drainage Dist. v. State, 93 Fla. 672, 112 So. 561), and all revenue anticipated by the issuance of bonds, thus enabling the reclamation work to promptly progress on a scale ap-propriate to the magnitude of the undertaking.

Following litigation as to earlier legislation, the present Everglades drainage district was established by chapter 6456, Acts of 1913 (section 1530 et seq., Comp. Gen. Laws Fla. 1927), comprising an area of approximately four million acres. Of these approximately one-fifth are now owned by the trustees of the internal improvement fund; the remainder being privately owned (except school lands). The boundaries of the district have been altered and much additional legislation enacted, but the act of 1913 is the genesis of the present district. See Martin v. Dade Muck Land Co., 95 Fla. 530, 116 So. 449, where a comprehensive legislative history of the district to 1927 will be found, prepared for the Supreme Court of Florida by Mr. Justice Whitfield.

Governmental affairs of the district are distinct from the general governmental affairs of the internal improvement fund, as well as from those of the state and the several counties, although management of the affairs of the district was originally imposed, as additional administrative duties, upon the same state officers who were trustees of the internal improvement fund. Those officers until recently composed the board of commissioners of Everglades drainage district. By chapter 13633, Acts of 1929, five civilian landowners in the district were added to the board, and, by chapter 14717, Acts of 1931, the board was constituted exclusively of five landowners in the district.

The questions before the court upon defendants' motions to dismiss the original and supplemental bills of complaint, as amended, and plaintiffs' motion for interlocutory injunction, are whether or not the legislation of 1929 and 1931 here complained of (chapters 13633 and 14717, supra), as well as official action taken or threatened pursuant to that and prior legislation, impairs the obligation of plaintiffs' bond contracts, in the following respects:

First. By diminishing the tax upon which plaintiffs are entitled to rely for the payment of their bonds.

Second. By relieving the board of commissioners of Everglades drainage district of their alleged obligation to pay annually into the sinking fund for the retirement of the district bonds sufficient funds of the district to pay the annual maturities.

Third. By relieving the trustees of the internal improvement fund of the obligation

claimed to rest upon them under chapter 7305, Acts of 1917, § 3, to purchase and pay for certificates representing unpaid drainage taxes of the district when there are no other bidders at the tax sales.

Fourth. By authorizing certificates of indebtedness, issued by the board of commissioners of Everglades drainage district to the trustees of the internal improvement fund under section 65 (b) of chapter 14717, to be used in payment of drainage taxes assessed against the public lands in the district owned by said trustees.

Fifth. By authorizing the board of commissioners of the district to receive bonds and interest coupons of the district in redemption of certain tax certificates issued for unpaid drainage taxes of the District.

Sixth. By constituting the board of commissioners of five civilian members instead of the state officers who originally, and when all now outstanding bonds were issued, composed the board.

Chapter 6456, supra, establishing the district (section 1530 et seq., Comp. Gen. Laws Fla. 1927), authorizes the board of commissioners to construct a system of canals, drains, levees, dykes, etc., and to maintain the same, in such manner as the board shall deem advantageous to drain and reclaim the lands in the district.

For the purpose of constructing, completing, and maintaining those works, that act (section 5) directly imposed upon the lands in the district a graduated tax on an acreage basis; the land being zoned for that purpose. By numerous amendments (see section 1534, Comp. Gen. Laws Fla. 1927), the plan of zoning has been altered and the acreage taxes increased from time to time as the bonded debt of the district was increased. Vital changes in this respect were provided in the acts of 1929 and 1931, supra.

By chapter 8412, Acts of 1921 (section 1592, Comp. Gen. Laws Fla. 1927), an annual ad valorem tax of one mill was levied upon all real and personal property in the district, "to be known as a maintenance tax and shall be used for maintenance, repairs, upkeep, and any other general or necessary purpose of the district."

The lands within the district held by the trustees of the internal improvement fund are subject to the acreage taxes above mentioned and all other taxes, including, since 1921, maintenance and ad valorem taxes, and the said trustees of the internal improvement fund, in furtherance of the trust upon which the lands are held, are authorized and empowered to pay the same out of any funds in their possession derived from the sale of lands, or otherwise. (Section 5, chap. 6456, supra, as amended, now section 1534, Comp. Gen. Laws 1927).

Section 6 of the act of 1913, brought forward unaltered as section 1535, Comp. Gen. Laws 1927, provides that "the proceeds arising from the acreage tax levied by this Article shall be used by the said board [of Commissioners of Everglades District] in the construction and maintenance of such canals, drains, levees, [etc.], . * * * and to the expenses of the board in the conduct of said work and its business generally, and to repay any loans and the interest thereon, and to the creation of a sinking fund for the retirement of the principal of the bonds that the board may issue under the provisions of this Article, and to the payment of the interest thereon."

Section 19 of the act of 1913 originally authorized the board to issue negotiable bonds not exceeding $6,000,000 outstanding at any time. That section has been amended from time to time to authorize the issuance of not exceeding $14,250,000, exclusive of those authorized (but never issued) by chapter 12016, Acts of 1927, now repealed. No bonds were issued until the original section 19 was amended by chapter 6957, § 10, Acts of 1915, to provide that "nothing herein contained shall be deemed a limitation of the right of the Legislature to authorize additional bonds of said Board, payable from drainage taxes within said district, provided any such additional authority shall be accompanied by the levy and imposition of additional taxes or assessments sufficient to meet the payment of the bonds authorized and interest thereon as the same shall become due; such payment to be provided for by a sinking fund as herein required, and such additional bonds shall constitute an obligation of equal dignity with the bonds herein authorized and equally with the bonds herein authorized may be entitled to payment from all drainage taxes then or theretofore imposed upon lands within said district without preference to any bonds or series of bonds over any other bonds or series of bonds." That section, as so amended, remained in effect at least as late as 1927. Section 1553, Comp. Gen. Laws Fla. 1927.

As future issues were authorized (see the Acts cited next hereafter), the acreage taxes were increased to provide funds for retirement of the additional bonds. Under orig-

inal section 19, bonds aggregating $3,500,000 were issued during 1915, 1916, and 1917. These have all been retired, in part by payment and in part by refunding bonds issued by authority of chapter 10027, Acts 1925.

By authority of successive amendments of original section 19, additional bonds have been issued under chapter 7862, Acts 1919, chapter 8413, Acts 1921, and chapter 9119, Acts 1923, codified as section 1178, Rev. Gen. St. Fla. 1920, and section 1553, Comp. Gen. Laws 1927. Chapter 10026, Acts of 1925, authorized $3,000,000 additional bonds which have never been issued. Chapter 10027, Acts 1925, authorized the issuance of refunding bonds, which have been issued to the extent of $3,842,000, and used to refund in part the original issues under the act of 1913, the issues under the act of 1919, and the issues under the act of 1923. There are now outstanding $9,919,000, including the refunding bonds.

The original act provides that the "faith and credit" of the board of commissioners shall be pledged by said bonds. This provision still remains intact. Section 1555, Comp. Gen. Laws Fla. 1927.

Section 23 of the act of 1913, brought forward unaltered as section 1557, Comp. Gen. Laws 1927, provides, inter alia: "This Article shall without reference to any other act of the Legislature of Florida be full authority for the issuance and sale of the bonds in this Article authorized. * * * The provisions of this Article shall constitute an irrepealable contract between the said board and said Everglades drainage district and the holders of any bonds and the coupons thereof, issued pursuant to the provisions hereof. * * * "

Section 24 of the act of 1913, which also has remained in force unaltered, and is now section 1560, Comp. Gen. Laws 1927, provides: "It shall be the duty of the State Treasurer or his successor in office, as custodian of the funds belonging to the said board of commissioners and to the said drainage district, out of the proceeds of the taxes levied and imposed by this Article and out of any other moneys in his possession belonging to the said board or to the said drainage district, which moneys so far as necessary are hereby set apart and appropriated for the purpose, to apply said moneys and to pay the interest upon the said bonds as the same shall fall due and at the maturity of the said bonds out of the said moneys to pay the principal thereof, and there shall be and there is hereby created a sinking fund for the payment of the principal of the said bonds, and the said board shall set apart and pay into such sinking fund annually out of the taxes levied and imposed by this Article, and the other revenue and funds of the said district, at least two per cent. of the amount of bonds outstanding. The said sinking fund for the payment of the principal of said bonds shall not be appropriated to any other purpose than that herein specified."

These provisions apply to all bonds subsequently issued, as all the subsequent authorizing acts are amendments of original section 19 of the act of 1913 (except the refunding act of 1925 [chapter 10027] which amends section 20 of the original act), and are not unrelated legislation, so that the subsequent amendments became in effect a part of the original act, thus preserving the contract feature thereof just referred to. Until 1927, whenever additional bonds were authorized by amendment to original section 19, such action was accompanied by an amendment of original section 5, or its codification (section 1164, Rev. Gen. St. 1920), which amendments impose additional acreage taxes by increasing the former rates, so as to provide additional funds, as required by original section 19, as amended by chapter 6957, Acts of 1915, hereinabove quoted.

In the several resolutions pursuant to which each series of bonds were issued, the board of commissioners provided for a sinking fund as contemplated by the statute, and further resolved that "there shall in addition be paid into the sinking fund, in time to reasonably pay the principal of said bonds after they mature, the amount of bonds maturing during such years."

Of the $9,919,000 bonds outstanding, the plaintiffs allege that they own "many thousand dollars," and specifically $51,000 principal past due and unpaid, and past-due interest coupons of the several issues aggregating approximately $107,000.

These bonds were all issued by the district and acquired by plaintiffs after the enactment of the legislation already referred to embracing the sinking fund provisions; the provisions for additional taxes to meet additional bonds when authorized; the provision that the statute under which the bonds were issued should constitute an irrepealable contract between the board and holders of the bond and coupons; that all bonds should be of equal dignity and share equally and without prejudice in payment from all drainage taxes then or theretofore imposed; and

other statutory provisions to which reference will be made hereafter. See sections 1553 and 1557, Comp. Gen. Laws 1927 (chapter 6456 (19), Acts 1913, and chapter 6957 (10), Acts 1915), hereinabove quoted.

By chapter 13711, Acts 1929, the Florida Legislature established a special tax district, designated as the Okeechobee flood control district, for the purpose of controlling the flood waters of Lake Okeechobee, the Caloosahatchee river, and vicinity. The original bill of complaint herein alleges that this district as established by the statute is "practically the Everglades Drainage District with some additional territory, and it was created for the purpose of taking over and financing certain improvements which theretofore had fallen within the scope and the powers conferred upon Everglades Drainage District." This act authorizes the issuance of $3,000,000 of bonds and levies acreage taxes upon four defined zones in the district to finance the operation of the district and to retire the bonds.

In 1929 the Florida Legislature also enacted chapter 13633, relating to the Everglades drainage district, which act, the bill alleges, was a companion bill with the Okeechobee flood district bill, chapter 13711, supra. Chapter 13633, relating to the Everglades drainage district, enacted that, in lieu of all acreage taxes theretofore levied upon the lands in Everglades drainage district, the acreage taxes prescribed in said act of 1929 should thereafter be imposed. The bill of complaint charges that the taxes imposed by this act are at substantially lower rates than those imposed by the statutes under which plaintiffs' bonds were issued.

In section 6 of chapter 13633, it is provided that "there shall be deducted from the taxes hereinabove provided for as to each acre of land within said [Everglades Drainage] District in each year, an amount equal to the sum of money levied for such year upon such land as an acreage tax, under the provisions of An Act of the Legislature of Florida, creating Okeechobee Flood Control District. * * *"

Chapter 13633 further purports to authorize the board of commissioners of Everglades drainage district to reduce the taxes levied by that act in each of the zones proportionately, to the extent of not more than 25 per cent. of the levy provided in said act, and to otherwise adjust such levy.

Section 26 of chapter 13633 provides that for the funding and retiring of the obligations of said district not evidenced by bonds the Everglades drainage district is authorized to issue $3,000,000 additional bonds. The bill alleges that no additional tax is levied to retire these bonds. Examination of the act discloses that new rates of acreage taxes were prescribed by section 6 of this act, which rates appear to be lower than those fixed by chapter 10026, Acts of 1925, which latter rates plaintiffs claim have become a part of their bond contract.

Certain portions of chapter 14717, Acts of 1931, are assailed by supplemental bill herein. This act re-zones the district for the purpose of levying acreage taxes, and by sections 7 and 8 prescribes new and exclusive rates of acreage taxes, imposing separately a "Debt Service Tax" for the purpose of paying principal and interest of "all obligations [not merely the bond obligations] of Everglades Drainage District heretofore incurred and now outstanding"; and an "Administration Tax" for the purpose of paying costs of administration, the proceeds of these taxes being placed in separate funds limited to those purposes. These are in addition to an ad valorem tax of one mill for administration purposes (section 8), and a maintenance tax (section 9). The act purports to authorize the board (section 43) to borrow against anticipated revenue in the administration and maintenance funds, and to pledge these funds to repay such loans.

Section 44 of the act of 1931 forbids the use of any avails of the taxes imposed by sections 7, 8, and 9 for any purpose other than therein prescribed, thereby limiting the participation of bonds in the drainage taxes to that portion of the tax designated as "Debt Service Tax." Section 7 of that act brings into participation of payment out of drainage taxes "all obligations now owing by Everglades Drainage District," but saving (section 44) any existing priorities. It should here be parenthetically observed that the Everglades drainage district has outstanding large obligations not evidenced by bonds.

The supplemental bill alleges that the rates prescribed in the act of 1931, for "Debt Service," are inadequate to meet the bond requirements of the district, and are substantially lower than the former rates, to the continuance of which plaintiffs allege they are entitled. The supplemental bill charges this act to be a plan to divert acreage taxes to other purposes, to the impairment of the plaintiffs' vested contract rights under former legislation; and specifically under the sinking fund provisions of section 24 of the act of 1913 (Comp. Gen. Laws Fla. 1927, §

1560). Reference will later be made to other provisions of the 1931 act, of which plaintiffs also complain.

■ Legislation by authority of which bonds are issued, and their payment provided for becomes a constituent part of the contract with the bondholders. Such a contract is within the protection of the Constitution, art. 1, § 10. The obligation of the bond contract, of which such legislation is a part, cannot be impaired, nor its fulfillment hampered or obstructed, by subsequent legislation to the prejudice of the vested rights of bondholders. This rule has reference to subsequent legislation which affects the contract directly, and not incidentally, or only by consequence. United States ex rel. Von Hoffman v. City of Quincy, 4 Wall. 535, 18 L. Ed. 403; Board of Liquidation of Louisiana v. McComb, 92 U. S. 531, 23 L. Ed. 623; Louisiana ex rel. Southern Bank v. Pilsbury, 105 U. S. 278, 26 L. Ed. 1090; Wolff v. New Orleans, 103 U. S. 358, 26 L. Ed. 395; Moore v. Otis (C. C. A.) 275 F. 747; Moore v. Gas Securities Co. (C. C. A.) 278 F. 111; Jinkins v. Entzminger (Fla.) 135 So. 785. As was said in United States ex rel. Von Hoffman v. City of Quincy, supra: "A different result would leave nothing of the contract, but an abstract right—of no practical value—and render the protection of the Constitution a shadow and a delusion."

In addition, section 23 of chapter 6456, supra, (section 1557, Comp. Gen. Laws Fla. 1927), specifically provides that "this act" (meaning the Everglades Drainage District Act) shall constitute an "irrepealable contract" between the board of commissioners and holders of bonds issued under the act. Contracts of this nature have been held impaired by subsequent legislation undertaking to lower the former statutory basis of assessment, Town of Samson v. Perry (C. C. A.) 17 F.(2d) 1; or to divert proceeds of assessments from the payment of obligations to pay which they were levied, Moore v. Otis (C. C. A.) 275 F. 747; Nelson v. Pitts, 126 Okl. 191, 259 P. 533, 53 A. L. R. 1137.

■ An impairment occurs when the value of the contract has been diminished by subsequent legislation. The question of impairment is not one of degree, but of encroaching in any respect upon the obligation—dispensing with any part of its force. United States ex rel. Von Hoffman v. City of Quincy, 4 Wall. 535, 18 L. Ed. 403; Green v. Biddle, 8 Wheat. 84, 5 L. Ed. 547; Bank of Minden v. Clement, 256 U. S. 156, 41 S. Ct. 408,

65 L. Ed. 857; Farrington v. Tennessee, 95 U. S. 679, 683, 24 L. Ed. 558, 559; Planters' Bank v. Sharp, 6 How. 301, 12 L. Ed. 447.

It is significant that, until the act of 1927, the symmetry of the original act of 1913 was retained, additional bonds having been authorized, and increased acreage taxes levied to pay the same—not by unrelated legislation—but by successive amendments of sections 19 and 5 of the original act, or sections of the Revised General Statutes in which they were codified.

■■ Though the state cannot by contract surrender its sovereign prerogatives in the performance of essential governmental duties (Contributors v. City of Philadelphia, 245 U. S. 20, 38 S. Ct. 35, 62 L. Ed. 124), nevertheless, when the state authorizes a taxing subdivision to contract by issuing bonds and to exercise the power of local taxation to the extent necessary to meet such obligations, the power thus given cannot be withdrawn so long as its exercise is necessary to satisfy the vested rights of bondholders. In such cases, the state and the subordinate taxing unit are equally bound. "The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute." United States ex rel. Von Hoffman v. City of Quincy, 4 Wall. 535, 18 L. Ed. 403; Board of Liquidation of Louisiana v. McComb, 92 U. S. 531, 23 L. Ed. 625; Galena v. Amy, 5 Wall. 705, 18 L. Ed. 560; Mobile v. Watson, 116 U. S. 289, 6 S. Ct. 398, 29 L. Ed. 620; Jinkins v. Entzminger (Fla.) 135 So. 785; State of Louisiana ex rel. Nelson v. Police Jury, 111 U. S. 716, 4 S. Ct. 648, 28 L. Ed. 574; Rorick v. Board (D. C.) 27 F.(2d) 377.

■ In Trustees v. Bailey, 10 Fla. 112, 81 Am. Dec. 194, it was held upon the same principles here under consideration that, at the instance of holders of bonds issued under the Internal Improvement Act of Florida of January 6, 1855, the trustees of said fund would be enjoined from appropriating any portion of that fund to purposes other than those named in the act so as to endanger the bondholder's security, even though such other appropriation be commanded by a subsequent act of the Legislature. In that case it is aptly said: "The State is as capable of making a contract as an individual is, and when made is as much bound by it."

■ The board of commissioners here contends that the Legislature may now appropriate a portion of the acreage taxes to the

payment of administration expenses, and to other obligations of the district, as provided in the acts of 1929 and 1931.

Although section 6 of the act of 1913 provides in general terms that the proceeds of the acreage taxes levied by section 5 shall be used, amongst other things, to pay the "expense" of the board in "its business generally," that section also provides that such proceeds shall be used to create a sinking fund for the bonds. Section 24 of the act of 1913 specifically and in detail provides that the proceeds of the acreage taxes and any other revenue of the district shall be used to pay interest on the bonds and to create a sinking fund for the retirement of the bonds, and that there shall be paid into this sinking fund annually not less than 2 per cent. of the amount of outstanding bonds. Said funds, so far as necessary for the purpose, are expressly "set apart and appropriated." Appropriation of those moneys for any other purpose is expressly prohibited. The reference to "expenses" in section 6 is general, but the provision for the sinking fund, found in section 24, is specific and mandatory, qualifying pro tanto the general language of section 6. If it be assumed that section 6 invests the board of commissioners with authority to use proceeds of the drainage taxes for administration expense or to pay its unbonded obligations, it is clear from the rigid language of section 24 that the Legislature did not intend such authority to be exercised to the prejudice of these specific interest and sinking fund provisions, for which purposes these funds are specifically appropriated and segregated, and the state treasurer mandatorily and unconditionally directed to apply them. See People v. Brooks, 16 Cal. 11, text 28, 30; 6 R. C. L. 334.

Payment of administration or other expenses or obligations out of acreage taxes levied to pay bonds issued under section 19, and its amendments, is at least limited to the residue of such funds after first meeting the interest and sinking fund requirements.

A similar legislative construction is discernible in the passage in 1921 of chapter 8412, providing a separate ad valorem tax which "shall be used for maintenance, repairs, upkeep, and any other general or necessary purpose of the District." Section 1 (Comp. Gen. Laws Fla. 1927, § 1592). This act was passed a little more than five years after the first bonds were sold, when the necessity for substantial maintenance expense was probably first encountered, and this additional tax was then provided to meet such expense.

Moreover, the act of 1913 pledged the "faith and credit" of the district for the payment of the bonds, which in effect, with bonds payable from the sources here involved, pledges the resources of the district. Duval Cattle Co. v. Hemphill (C. C. A.) 41 F.(2d) 433, 438. The board of Commissioners by resolution, pursuant to which each series of bonds was issued, bound itself unconditionally to pay into the sinking fund sufficient moneys to pay the annual maturities. As the statute fixed only a minimum requirement for the sinking fund, these resolutions were within the board's authority, and are a part of the bond contract.

We hold, therefore, that the provisions of chapter 6456, Acts 1913, and its several amendments pursuant to which plaintiffs' bonds were issued and acreage taxes to pay the same were levied, constitute a contract between plaintiffs and the district; that the legislation imposing acreage taxes to pay those bonds and interest, which was in effect when the bonds were issued, cannot be withdrawn, nor can the proceeds of such taxes be diverted to other purposes, so long as such proceeds are necessary to pay interest and create a sinking fund as prescribed by section 24 of chapter 6456, now section 1560, Comp. Gen. Laws 1927, and the several resolutions of the board, all of which are parts of the bond contract. We further hold that the proceeds of the acreage taxes and other funds of the district (except the ad valorem tax under the act of 1921) are specifically appropriated (Lainhart v. Catts, 73 Fla. 735, 75 So. 47, text 54; Bannerman v. Catts, 80 Fla. 170, 85 So. 336; State v. Allen, 83 Fla. 214, 91 So. 104, text 105, 26 A. L. R. 735), and pledged to the extent and for the purposes just mentioned; the appropriation and pledge continuing so long as these funds are necessary to meet the requirements of the bonds issued pursuant thereto. It is the duty of the state treasurer and of the board of commissioners to devote said funds to the purposes named, as far as may be necessary, before using any part thereof for any other purpose.

If, as urged by the board, it would by this holding be left without adequate operating or maintenance revenue, the situation may be met by further exertion of the taxing power to provide the same.

The board cites numerous cases, such as White v. Mayor of Decatur, 119 Ala. 476,

23 So. 999; City of East St. Louis v. U. S. 110 U. S. 321, 4 S. Ct. 21, 28 L. Ed. 162; and Clay County v. U. S., 115 U. S. 616, 6 S. Ct. 199, 29 L. Ed. 482 (see, also, 44 C. J. 1374), to the effect that, where the principal and interest of bonds constitute a charge upon general revenue of a city or county, such charge operates only upon surplus revenues after paying necessary operating and governmental expenses. But those cases are not in point. Neither the functions of the Everglades drainage district, nor the purpose of its organization, are analogous to those of a city or county. The district is not for general governmental purposes, but it is a "statutory subdivision * * * for special governmental purposes"; namely, for local improvement purposes. The acreage taxes are not "general revenue" for purposes of "general government," within the sense of the cases last cited, but are "special assessments" imposed solely to pay "for benefits to accrue from the public improvement." Martin v. Dade Muck Land Co., 95 Fla. 530, 116 So. 449, text 464, 468; Bannerman v. Catts, 80 Fla. 170, 85 So. 336. The consequences of the differences pointed out are well defined in Village of Kent v. U. S. (C. C. A.) 113 F. 232, which is a complete answer to this contention. See, also, Lainhart v. Catts, 73 Fla. 735, 75 So. 47, text 52. Nor in the cases cited by the board was there a specific segregation of the bond funds and a requirement that they be disbursed for designated purposes, as there is here. It is held in Florida that even general creditors of a municipality, holding claims secured by general taxation, may enforce their claims by mandamus where there is a fund on hand out of which payment is authorized and required, and which is sufficient for the purpose. State ex rel. N. Y. Life Ins. Co. v. Curry (Fla.) 139 So. 891, opinion filed Feb. 16, 1932.

■■■ The board also contends that, as the acreage taxes are special assessments based upon benefits, the Legislature has the inherent power to redetermine the benefits at any time and to reduce or vary the special assessments accordingly. As respects the taxpayer alone, the Legislature may undoubtedly do so. Bannerman v. Catts, 80 Fla. 170, 85 So. 336. But the power of taxation must be exercised consistently with the principles which preserve the inviolability of contracts. Graham v. Folsom, 200 U. S. 248, 26 S. Ct. 245, 50 L. Ed. 464; Mobile v. Watson, 116 U. S. 289, 6 S. Ct.

398, 29 L. Ed. 620. The taxing power cannot be exercised so as to impair the obligation of contracts by directly abrogating or diminishing the means by which contracts, entered into in reliance upon such taxing power, can be performed. Louisiana ex rel. Southern Bank v. Pilsbury, 105 U. S. 278, 26 L. Ed. 1090; United States ex rel. Von Hoffman v. City of Quincy, 4 Wall. 535, 18 L. Ed. 403; Jinkins v. Entzminger (Fla.) 135 So. 785. If the assessment levied in any instance exceeds the benefits, the taxpayer, in the absence of waiver or estoppel, may secure appropriate judicial relief by the force of constitutional principles applicable to that situation, and bondholders would have to abide the consequences, as they took their bonds with notice that they are payable from special assessments. We are here concerned, however, with a voluntary reduction by legislative or administrative action, to the alleged impairment of plaintiffs' contract rights as a bondholder. We are not here concerned with the validity of any of these acts as taxing measures.

■■■ It becomes material to now determine what rates of acreage taxes, as levied by the several acts, are within the obligation of the bond contracts of these plaintiffs.

Plaintiffs contend that they are entitled to the rates levied by chapter 10026, Acts 1925, which are substantially higher than those imposed by the act of 1923, and prior acts. Chapter 10026 is an amendment of sections 1160, 1164, and 1178, Rev. Gen. St. 1920, which sections are, respectively, a codification of sections 1, 5, and 19 of the original act of 1913, as amended. Chapter 10026 altered the boundaries of the district; authorized the issue of $3,000,000 additional bonds; and, conformably to the requirements of chapter 6957, Acts of 1915 (section 10), provided additional taxes by increasing the former rates of acreage taxes. These additional bonds have never been issued. Plaintiffs contend that, notwithstanding that fact, the refunding bonds issued pursuant to chapter 10027, Acts 1925, some of which plaintiffs own, were by the latter act constituted "an obligation of equal dignity with any and all other bonds heretofore, or that may hereafter be, issued against and by said district," thereby placing these refunding bonds on a parity of obligation and payment with other bonds, from which the plaintiffs conclude that "the refunding bonds were issued and sold in reliance upon the rate of taxation imposed by chap. 10026," thereby constituting the rates fixed

by the latter act a part of the bond contract as to the refunding bonds.

Although the refunding bonds are on a parity of obligation and payment with the other bonds of the district, we do not concur in the view that plaintiffs have acquired a vested contract right in the rates fixed by chapter 10026. Plaintiffs purchased their bonds (except the refunding bonds, which will hereafter be dealt with) when the rates fixed by the act of 1923, or prior acts, were in effect, and in reliance upon the rates fixed by those acts—not upon the 1925 act. To the extent of the increase in rates prescribed by chapter 10026, those rates are in the nature of an offer or proposal to prospective bondholders who may purchase bonds in reliance upon such increase. That offer has not been accepted, as no additional bonds authorized by chapter 10026 have been issued. This situation is contrary in that respect to the facts in Louisiana ex rel. Southern Bank v. Pilsbury, supra, wherein the plaintiffs' bonds were acquired after, and in reliance upon, the supplemental act increasing the levy. To the extent of the increase over the former rates, the additional taxes levied by chapter 10026 do not constitute a specific trust fund for the benefit of plaintiffs' bonds, as was the case in Baring v. Dabney, 19 Wall. 1, 22 L. Ed. 90, upon which plaintiffs rely, but to the extent of such increase they constitute "additional taxes" to pay the "additional" bonds authorized by the act, which is all that is required in the plaintiffs' bond contract, this particular phase of which rests in chapter 6957, § 10, Acts of 1915. We are not now concerned with what the situation may be if and when additional bonds are issued by authority of chapter 10026. Until some of the additional bonds authorized by chapter 10026 are issued and sold, there is no consideration for the increased rates therein provided, and such increases do not come into operation as a part of the board's contract with existing bondholders who acquired their bonds in reliance upon the rates fixed by prior acts. Until additional bonds are sold pursuant to the 1925 act, the rates fixed by that act are a potential—not a vested—right as to the holders of bonds issued under prior acts. United States v. County Court (C. C.) 2 F. 1.

The same is true as to the rates fixed by chapter 13633, Acts 1929, under which $3,000,000 additional bonds were authorized but never issued.

Nor does the issue of refunding bonds under chapter 10027 bring into operation the increase in rates provided in chapter 10026, so as to give plaintiffs a vested right in such increase. Chapter 10027 is not an amendment of original section 19, which relates to the issue of bonds and additional bonds. It is an amendment of original section 20, which relates to redemption (and denomination) of bonds. These refunding bonds are in lieu of other bonds outstanding under the 1923 act and prior acts, which former bonds were retired pro tanto by the proceeds of these refunding bonds. There is no authority in this act to fund or refund any obligations of the district other than existing bonds and interest thereon. The indebtedness of the district, therefore, was not increased, nor was any additional indebtedness created by the refunding bonds. Their issue was a renewal (See Davis v. Dixon, 98 Fla. 87, 123 So. 536, text 538; State v. Weinrich, 291 Mo. 461, 236 S. W. 872) of an existing debt which had been incurred in reliance upon the rates of taxation fixed by the 1923 act, and prior acts. The refunding bonds are therefore not "additional" bonds within the sense of chapter 6957 (section 10), Acts of 1915, so as to require the levy of "additional" taxes, although such refunding bonds are of equal dignity with all other outstanding bonds and are entitled to parity of payment out of the sinking fund hereinabove referred to. No specific increase in tax rates having been levied or authorized in the refunding act, the tax levies applicable to the retired bonds apply also to the refunding bonds by which the former bonds were retired.

We hold, however, that the tax levy imposed by chapter 9119, Acts 1923, the latest act pursuant to which plaintiffs' bonds (other than refunding) have been issued, is a part of plaintiffs' bond contract. As against the district and its managing officers, plaintiffs are entitled to the continued levy of drainage taxes as fixed by that act, or their equivalent, so long as necessary to pay interest and provide a sinking fund as required by section 24 of the original act of 1913 (section 1560, Comp. Gen. Laws 1927) and by the resolutions of the board pursuant to which plaintiffs' bonds were issued. Whatever may be the judicially determined rights of taxpayers in respect to the assessments against their lands, voluntary legislative or administrative action which has the effect of directly diminishing the potency or

benefits of the act of 1923, either by reduction of taxes or diversion of proceeds to administration or other purposes, impairs the obligation of plaintiffs' contract. United States ex rel. Von Hoffman v. City of Quincy, 4 Wall. 535, 18 L. Ed. 403; Board of Liquidation of Louisiana v. McComb, 92 U. S. 531, 23 L. Ed. 625; Galena v. Amy, 5 Wall. 705, 18 L. Ed. 560; Trustees v. Bailey, 10 Fla. 112, 81 Am. Dec. 194; Jinkins v. Entzminger (Fla.) 135 So. 785.

We hold, therefore, that section 26 of chapter 13633, Acts 1929, to the extent that it purports to authorize the issuance of $3,000,000 additional bonds, is inoperative as against these plaintiffs, unless the taxes therein levied are a sufficient increase over those fixed by the act of 1923 to pay the additional bonds. Whether or not they are is a question of fact. We further hold that section 6 of chapter 13633, in so far as it purports to fix acreage taxes, or to authorize the board to make deductions (on account of Okeechobee flood control district or otherwise) or reductions below those imposed by chapter 9119, Acts 1923, or a substantial equivalent thereof, or to otherwise diminish the funds provided by the act of 1923 for the payment of bonds issued pursuant to that and prior acts, is inoperative as against these plaintiffs. Sections 7 and 8 of chapter 14717, Acts 1931, and those portions of sections 43 and 44 of said section 14717, which purport to fix acreage taxes and to create an administration fund from the proceeds of acreage taxes, are also inoperative against the plaintiffs in so far as those sections result in reducing or diverting the proceeds of drainage taxes so that the amount thereof available for interest and sinking fund requirements for outstanding bonds will be less than under chapter 9119, Acts 1923. Nor may the proceeds of the administration fund be pledged pursuant to section 43 (d) to the prejudice of interest and sinking fund requirements to which plaintiffs are entitled. Moreover, those portions of sections 7 and 44 (b) of chapter 14717, which purport to bring into participation of payment from the proceeds of acreage taxes obligations of the district other than bond obligations, are likewise inoperative as against these plaintiffs until all interest and sinking fund requirements for said bond obligations, as hereinabove adjudicated, have been fully met.

Section 70 of chapter 14717 purports to authorize the issuance of district bonds for the purpose of refunding any "bond, note, certificate of indebtedness, or other obligation now outstanding, for the payment of which the credit of * * * District is pledged" (subdivision (a), but levies no additional tax. The district now has outstanding large obligations not represented by bonds. So far as bonds may be issued under this section for the sole purpose of refunding existing bonds issued pursuant to the act of 1913 and its amendments, plaintiffs' bond contract would not be impaired. The same situation would obtain as with the refunding bonds issued under chapter 10027, hereinabove discussed. Section 70 (i) purports to make these refunding bonds payable from the debt service fund provided in sections 7, 43, and 44 of the act, which fund in turn is derived from acreage taxes. In so far as the issue of bonds might be attempted under this section for the purpose of paying "notes, certificates of indebtedness or other obligations" of the district, such bonds would be funding—not refunding—bonds. While the indebtedness of the district might not be thereby increased, nevertheless, as against these plaintiffs it would bring into participation of payment out of acreage taxes what, as to the plaintiffs, would be "additional" bonds payable from acreage taxes, unaccompanied by the levy of additional taxes sufficient to pay the same, contrary to chapter 6957, Acts 1915, section 10, and, to the extent that such bonds were issued for any of the purposes last named, such action would be an impairment of plaintiffs' contract obligation. While under section 6 of the original act there would seem to be no objection to the use of acreage taxes to pay unbonded indebtedness after the sinking fund requirements of section 24 have been fully met, the issue of additional bonds without the levy of sufficient additional taxes to pay the same is forbidden, as against bondholders, by chapter 6957, Acts 1915, section 10, and there is a reasonable basis for the distinction.

An argument is made in plaintiffs' briefs as to the validity of the unit district plan provided in sections 10 to 42, inclusive, of the act of 1931, and the issuance of further bonds thereunder, but as these sections are not assailed by the bill of complaint, we do not consider them.

This disposes of the first and second questions hereinabove stated. We now take up the third.

Under section 12 of the original act of 1913, when lands in the district were sold for nonpayment of drainage assessments,

1060

and when there were no bidders at the sale, the tax collector was required to bid off such land for the board of commissioners of Everglades drainage district.

The bill of complaint alleges that, after the sale of bonds under the act of 1913, as amended in 1915, it was required as a condition of the purchase of additional bonds by buyers that the last-mentioned provision of section 12 be changed, and that accordingly chapter 7305, Acts of 1917, was enacted, section 3 of which (section 1541, Comp. Gen. Laws 1927) amends section 12 of the original act of 1913, and provides: " * * * In case there are no bidders, the whole tract [upon which drainage taxes are unpaid] shall be bid off by the tax collector for the trustees of the internal improvement fund, and shall be held by said trustees during the period herein allowed for the redemption of said lands in like manner and with like effect as lands sold to the State for non-payment of State and county taxes are held by the State, as now provided by law." Section 4 of chapter 7305 provides that the tax collector shall issue a tax certificate to the trustees of the internal improvement fund as of the date of sale, "and if the land is not redeemed on or before two years from the date of such certificate, the title to the same shall immediately vest in the said Trustees without the issuing of any deed as provided in other cases, and the certificates held by the said Trustees shall be evidence of the title of the said Trustees." Chapter 10024, Acts 1925, and chapter 14717, Acts of 1931, purport to alter the redemption period. The trustees are authorized to sell and convey such lands, and the proceeds thereof "shall be applied by said Trustees in payment of drainage taxes or assessments, or other obligations of said Trustees." Tax certificates held by the trustees may be redeemed within the time prescribed, and the amount paid upon such redemption is remitted to the trustees. Chapter 7305, § 5, Acts 1917 (Comp. Gen. Laws 1927, § 1547).

Under then existing laws, when state and county taxes were unpaid, the lands were sold, and, if there was a private purchaser, a certificate was issued to him, for which he was required to pay at the time of the purchase. Section 974, Comp. Gen. Laws Fla. 1927. In the absence of a private purchaser, the lands were bid off to the state, no payment being required by the state, future taxes against such lands being omitted until a redemption occurred. After two years the private purchaser could apply for and receive a deed. When land was bid off to the state, title thereto vested in the state two years after the issuance of the certificate, but the lands remain subject to redemption until a tax deed is issued to a private purchaser who might purchase the certificate from the state and, after two years from the date of the certificate, apply for a deed.

Viewing the history of this legislation in the light of the allegations of the bill of complaint, it appears that by 1917 it had become apparent that drainage taxes might remain unpaid to such an extent that funds of the district would be insufficient to meet bond requirements if additional bonds were issued, and that, before additional bonds would be salable, it would be necessary to guard against such a situation. This was undertaken by requiring the trustees of the internal improvement fund, instead of the board of commissioners, to become the purchasers of all tax certificates for which there was no other purchaser, thus preventing tax default and, consequent depletion of the district fund available for interest and sinking fund requirements. The provisions of the act of 1917 relating to the trustees are harmonious with the purposes of the internal improvement fund as defined by chapter 610, Acts 1855. See Martin v. Dade Muck Land Co., 95 Fla. 530, 116 So. 449.

Although the act of 1917 does not in terms require the trustees to "pay for" the certificates bid in for them, it is obvious that such was the legislative intent. No purpose is evidenced to make a gift of these lands to the trustees. According to the allegations of the bill, the trustees have so construed the act by paying for such certificates, and paying subsequent drainage taxes on certificated lands, until 1927, but not since.

Nor does the act of 1917 in express terms fix the time when the trustees shall pay for their certificates. The act of 1917, requiring all lands for which there were no other purchasers to be bid in for the trustees, must be construed in pari materia with other parts of the 1913 act, of which the act of 1917 is an amendment. By section 13 of the original act, which has remained unaltered (see section 1542, Comp. Gen. Laws 1927, also chapter 14717, § 56 (d), when lands are sold for taxes, the tax collector must require immediate payment "by any person to whom any parcel of such land may be struck off. * * *" The act of 1917 requires the tax collector to issue tax cer-

tificates to the trustees at the time of sale, just as to any other purchaser. Although section 17 of the original act provided that proceeds of redeemed certificates should be paid to the board of commissioners, the amendatory act of 1917 provides that, when certificates bid in for the trustees are redeemed, the proceeds of such redemption shall be remitted to the trustees. There would seem to be no occasion for the latter provision, unless the Legislature contemplated that the trustees should have previously paid for the certificates. Otherwise, the proceeds of redemption should go to the district as its property. No legislative intent is evidenced by the act to postpone payment by the trustees for their certificates beyond the time fixed for payment by other purchasers, and we see no sufficient reason why the act should be so construed. Although the word "person" is frequently held not to embrace public governmental bodies, such as cities and counties, we see no reason why that word as used in section 13 of the original act—of which the act of 1917 is amendatory—should not apply to the trustees, dealing as it does, not with governmental affairs, but with business transactions in connection with contract rights. The provisions of the act of 1917 (section 3 [Comp. Gen. Laws 1927, § 1541]) that lands bid off for the trustees "shall be held by said trustees during the period herein allowed for the redemption of said lands in like manner and with like effect as lands sold to the State for non-payment of State and county taxes are held by the State" merely analogizes the two situations with respect to the status of the lands during the redemption period, the vesting of title when lands are not redeemed, the further sale of tax certificates by the trustees to private persons, and the like. That the state does not under general tax laws pay for lands bid off to it does not, in view of the provisions of original section 13 of the Everglades Act, relieve the trustees from paying for the certificates bid off for them as indicated.

We hold, therefore, that chapter 7305, Acts of 1917, is a part of the contract with bondholders, furnishing an additional measure of security upon which they are entitled to rely, and that it is the duty of the trustees of the internal improvement fund to pay for drainage tax certificates immediately when the lands are bid off for the trustees. This refers, of course, to certificates representing unpaid drainage taxes, the levy of which is a part of the bond contract. This disposes of the third question. We now take up the fourth.

By section 5 of the original act, as amended (section 1534, Comp. Gen. Laws 1927), lands within the district "held" by the trustees of the internal improvement fund are subject to drainage taxes, and the trustees are authorized and empowered to pay the same "in furtherance of the trusts upon which the said lands are held," the latter referring to the grant under the Swamp Land Congressional Act of 1850. In section 48 of the act of 1931, this provision is brought forward and the language of the corresponding former provision is emphasized by adding that these lands shall be subject to taxes "in the same manner as privately owned lands." It is conceded that public lands held by the trustees and which have never been disposed of are subject to these taxes, but as to lands reacquired by the trustees through tax sales pursuant to chapter 7305, Acts 1917, section 4, the trustees deny liability for subsequent taxes.

The act of 1917 (section 4) provides that, when lands are bid off for the trustees, a tax certificate shall immediately issue in the name of the trustees "and if the land is not redeemed on or before two years from the date of such certificate, the title to the same shall immediately vest in the said Trustees * * * and the certificates * * * shall be evidence of the title of the said Trustees." The trustees are authorized to sell such lands, execute a deed therefor, "as other deeds made by them are signed and shall vest in the grantee * * * the fee simple estate to such lands." The proceeds of such sales, including any profits realized, are the property of the trustees, and are to be devoted to the obligations of the trustees, including drainage taxes. If tax certificates held by the trustees are redeemed, the proceeds of the redemption go to the trustees to be used as required by law.

These and other provisions, when adjusted to their proper perspective in relation to the entire Everglades legislation, lead us to hold that, so far as the bond contract is concerned, lands thus bid in for the trustees (commonly referred to as "certificated" lands) become "lands within the Everglades Drainage District 'held' by the Trustees of the Internal Improvement Fund," within the meaning of section 5 of the original act, two years after the date of the certificate, when title vests in the trustees if the certificate be not sooner redeemed.

As these provisions are a part of the bond

1062

contract, it is the duty of the trustees to pay drainage taxes levied on such lands from and after the time when title vests in the trustees pursuant to the acts under which plaintiffs' bonds were issued, such payment to be made from funds derived by the trustees from "the use or sales of swamp and overflowed lands held by the trustees * * * under the trusts declared in chapter 610, Acts 1854–1855 * * * and subsequent amendatory and supplemental statutes." Martin v. Dade Muck Land Co., 95 Fla. 530, 116 So. 449, headnote 3. Although the powers and duties of the trustees are subject to legislative control, the trustees cannot, even by legislative direction, execute a later trust to the direct prejudice of contract rights of third parties in the execution of a prior trust. Trustees of Internal Imp. Fund v. Root, 59 Fla. 648, 51 So. 535.

Although all lands bid off for the non-payment of taxes remain charged with the lien of subsequent taxes (chapter 7305, § 2, Acts 1917 [Comp. Gen. Laws 1927, § 1531]), which would include lands bid off to the trustees, we discover no duty imposed by the statute upon the trustees to pay drainage taxes during the two years that the tax certificate is pending and subject to redemption, as the lands are not during that period held by the trustees within the meaning of section 5 of the original act, but are held "in like manner and with like effect as lands sold to the State for non-payment of State and County taxes." Section 3, chap. 7305 (section 1541, Comp. Gen. Laws 1927).

If it were not the recognized legislative intent that the trustees should pay taxes on certificated lands after title thereto vests in the trustees, it is strange that for fourteen years—from 1917 to 1931—no legislative attempt was made to so declare. The bill of complaint alleges, also, that the trustees paid these taxes until 1927. That subsequent taxes are omitted and not paid by the state upon lands for which it holds tax certificates under general taxation statutes does not by analogy relieve the trustees of their obligation just stated, in view of the express provisions of section 5 of the original act, as amended (Comp. Gen. Laws 1927, § 1534).

We also hold that under the act of 1917, so far as the rights of these plaintiffs are concerned, tax certificates issued to the trustees are held by them in their own right as trustees of the internal improvement fund under chapter 610, supra, and not in trust for the board of commissioners.

By sections 56 (c), 65 (a), and 65 (b) of chapter 14717, Acts 1931, it is enacted that, when there are no other bidders at tax sales, the lands shall be struck off for the board of commissioners (not to the trustees of the internal improvement fund, as has been the case since 1917); that tax certificates now held by the trustees, resulting from tax sales of former years, are held by said trustees in trust for the board of commissioners; that the trustees shall assign to the board all such tax certificates now in the hands of the trustees, subject to the right of the trustees to receive compensation therefor from the board; and that any sum of money found to be owing from the board to the trustees by reason of such assignment may be paid by the relinquishment by the board of its rights in such tax certificates as may be agreed upon, and for any balance then remaining the board may issue its certificates of indebtedness to the trustees, which certificates of indebtedness shall be receivable by the board of commissioners from the trustees, or from any person who shall thereafter purchase lands within the district, in payment of drainage taxes upon lands which at the enactment of the statute were held, or may hereafter be held, by the trustees, and that such certificates of indebtedness shall be liquidated as they are presented in payment of drainage taxes upon such lands. The effect of these provisions is to entirely destroy duties and obligations now and heretofore resting on the trustees which are a part of plaintiffs' security and one of plaintiffs' remedies against default in payment of their bonds.

In the view we have taken of chapter 7305, Acts 1917, as it relates to the trustees of the internal improvement fund, the three last-mentioned sections of the act of 1931, for obvious reasons, impair the obligation of plaintiffs' bond contract, and as to the plaintiffs are inoperative. Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. Ed. 93; Moore v. Gas Securities Co. (C. C. A.) 278 F. 111; Moore v. Otis (C. C. A.) 275 F. 747; In re Cranberry Creek Drainage Dist., 202 Wis. 64, 231 N. W. 588.

Section 67 of the 1931 act is also assailed by the supplemental bill, but, as that section depends for its operation upon the validity of other sections which we have held inoperative, it is unnecessary to consider that section in detail. This disposes of the fourth question.

█ As to the fifth: Section 71 of the act of 1931 enacts that "in the redemption of land from tax certificates which shall be transferred to the Board under the provisions of this Act, and in the redemption of lands which shall be sold to the Board for the non-payment of the taxes assessed for the year 1930," the person entitled to redeem may pay the amount requisite for redemption with bonds of the district, or interest coupons, at par. This section does not purport to extend that privilege to the redemption of certificates held by the trustees, nor to the redemption of lands sold to the trustees. Operation of the latter provision of the section depends upon the existence of one of the two conditions recited in the first part of the section. As we have held that the provision for the transfer of outstanding tax certificates by the trustees to the board and the provision for future certificates to be bid off for the board are both inoperative as against these plaintiffs, it leaves no field in which section 71 may lawfully operate, because, as against these plaintiffs, there can be no certificates assigned by the trustees to the board and no lands struck off to the board, until the requirements of plaintiffs' bond contract are satisfied. We therefore do not express an opinion as to how far, if at all, the Legislature may authorize the payment of drainage taxes, or the redemption of tax certificates from their lawful owners, with bonds in lieu of cash.

██ As to the sixth question: The provisions of the 1931 act, changing the personnel of board of commissioners to five civilians in lieu of five state officers as originally provided, impairs no vested contract right of plaintiffs. The district remains, with officers empowered to perform all its duties toward bondholders. Neither the resources nor the remedy for the payment of plaintiffs' bonds are affected within the purview of the contract clause of the Constitution. A mere change in personnel of a public board or body is not usually regarded as an impairment of contract obligations. See State v. Knowles, 16 Fla. 577; Graham v. Folsom, 200 U. S. 248, 26 S. Ct. 245, 50 L. Ed. 464; Mobile v. Watson, 116 U. S. 289, 6 S. Ct. 398, 29 L. Ed. 620; State v. Goodgame, 91 Fla. 871, 108 So. 836, 47 A. L. R. 118; Board v. Phillips, 67 Kan. 549, 73 P. 97, 100 Am. St. Rep. 475; 1 Cooley Const. Lim. (8th Ed.) p. 560; 12 C. J. 1008.

Interlocutory injunction will issue conformable to the views here expressed.

BRYAN, Circuit Judge (dissenting in part).

I dissent from so much of the majority opinion as holds the trustees of the internal improvement fund liable to pay for tax certificates issued upon the failure of landowners to pay drainage taxes. The trustees in my opinion hold the certificated lands in trust for the bondholders and other creditors of the drainage district. The Compiled General Laws provide that lands upon which drainage taxes are delinquent may be sold, and if there is no private bidder, shall be "bid off" by the tax collector for the trustees to be held by them for the two-year period allowed for redemption "in like manner and with like effect as lands sold to the State for non-payment of State and county taxes are held by the State." Comp. Gen. Laws 1927, § 1541. In the case of a sale for nonpayment of ordinary state and county taxes, if there are no private bidders, the land is bid off by the tax collector for the state. Section 972. Two years are allowed for redemption, but the owner may redeem at any time before the land is sold to another. Hightower v. Hogan, 69 Fla. 86, 68 So. 669. When land in the drainage district has been bid off for the trustees for the non-payment of drainage taxes, the title vests in the trustees, but they hold it subject to the owner's right of redemption which continues until the land is sold. The sale must be for at least as much as accrued taxes, and, in the event of such a sale, but not otherwise, the trustees are required to pay the delinquent drainage taxes. If they were purchasers in their own right, their obligation to pay would naturally arise as of the date of the tax sale, and would not be conditioned on a future sale. The provision of section 1, c. 9119, Laws of 1923, subjecting land within the drainage district held by the trustees to drainage taxes, refers to land owned by the trustees in their own right, and not to land held in trust under tax certificates. If it had been the intention of the Legislature to bind the trustees as purchasers of land upon which drainage taxes had not been paid, there should and doubtless would have been a plain and unequivocal provision to that effect. It is not to be inferred that the Legislature intended to impose a burden as great as is here contended for merely because it adopted existing provisions of law applicable to the holding and disposition of lands by the state upon default in the payment of ordinary taxes.

Upon the other questions involved, I concur in the opinion of the majority.